### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### GETLAN IRON WORKS, INC., Respondent.

No. 374, Docket 30918.

United States Court of Appeals Second Circuit.

Argued March 15, 1967.

Decided May 23, 1967.

Theodore Martineau, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Washington, D. C., on the brief), for petitioner.

Bertrand B. Pogrebin, Mineola, N. Y. (Harry H. Rains, Mineola, N. Y., on the brief), for respondent.

Before KAUFMAN, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order requiring respondent Getlan Iron Works, Inc. ("the Company"), inter alia, to bargain with one union and to withdraw recognition from another. Because this is one of those rare instances where we find a lack of substantial evidence to support one of the Board's key findings, we decline to enforce the order to bargain and remand for further findings; as to the latter portion of the order, we grant enforcement.

The pertinent facts as stated by the Board[1] were as follows: The Company, controlled by its president Marvin Getlan, manufactures iron and steel building construction products. The working force consists of shopmen who fabricate the products and crews who install them in buildings. The unit involved in this proceeding is the former; it varies from five to twelve men. In 1959, these shop employees were organized by Shopmen's Local Union No. 455 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO, which signed a contract with respondent that year. Another contract was signed thereafter, covering July 1961 to June 30, 1964. This contract was the general agreement Local 455 had with about 200 employers in the area; half belonged to a trade association which did the principal bargaining with Local 455. In the past, non-member employers ("independents") like respondent accepted the terms agreed upon by the association and Local 455.

In April 1964, Local 455 wrote all employers giving notice of termination in June; during June, it gave copies of a proposed new agreement to them, stating that "independents" would no longer be able to await the outcome of the bargaining with the trade association. No serious negotiations were conducted during June, and on July 1, Local 455 notified the employers that the old contract was being extended to July 10, the terms of the new contract to be retroactive to July 1. On July 2, respondent met with representatives of the local and approved part and rejected part of the proposed agreement; a future meeting, with no date set, was agreed upon. Since negotiations with the trade association were pending and the employees were working under the expired contract, there was no urgency. A somewhat changed proposed agreement was sent to the independents on July 15.

On July 22, Local 455 voted to strike those employers who had not signed the extension, and the following morning, with no prior notice to the Company, its employees gathered outside the plant. On arriving, Getlan asked the shop steward what had happened; the latter told him that since the Company had not signed a contract, the employees were on strike. The steward assured Getlan that a business agent would be there later in the day to straighten things out, but he never arrived. Regular picketing continued for two weeks, and then became intermittent; meanwhile the Company's other employees worked and material left the plant. On the day the strike began, the Company had eight workers in the unit, and a foreman who resigned that day. Five were members of Local 455; all struck except one employee who was not a member of the local.

Up to this point, it would be difficult to characterize what had taken place as serious bargaining by Local 455 with the Company, a small independent. The local was focussing its efforts on the trade association and the larger independents. Indeed, the Board concedes that the Company had not yet done any-

---

1. A three-member panel of the Board adopted the findings and conclusions of the trial examiner.

thing wrong, and the strike against it was at that time economic in nature.

However, on July 27, Local 455 asked respondent to be at a previously scheduled arbitration meeting (dealing with a grievance) a little early to carry on negotiations. Getlan arrived early at the meeting the next day, settled the grievance, and began negotiating. Some proposals by the union would have continued provisions of the old contract; Getlan agreed to some of those and objected to others. There was also disagreement about the term of the new contract. During the few weeks after July 28, Getlan and his general manager made efforts to persuade various employees to return to work.

About a week after the July 28 meeting, respondent advertised for workers in a local newspaper. One Iacono was subsequently hired on August 15, and told that the job was permanent. For the two weeks beginning August 27, most of respondent's employees worked. Late in August, Getlan talked with his general manager about a new union, Industrial Production Employees Union, Local 42, AFL–CIO, and its president Gerald Lasky. A few days later, Getlan introduced Lasky to his manager and told him that he and Lasky were "bargaining" for a contract. Thereafter, the manager encouraged the employees to sign up with Local 42. Lasky obtained signed authorization cards from four of the eight employees working in the shop, and shortly thereafter the Company executed a contract with Local 42. The contract contained union security and check-off provisions; in accordance with it, the Company subsequently began withholding monies from the pay checks of the shop employees for union dues and initiation fees and paid these sums over to Local 42.

On these facts and others discussed in greater detail below, the trial examiner and the Board found that the Company had, inter alia, violated sections 8(a)(5) and (1) of the Act by its failure to bargain in good faith with Local 455 on and after July 28, by its execution of a contract with Local 42 when that union was not the authorized representative of the employees, and by its solicitation of and promise of benefits to striking employees to abandon the strike. The Board also found that the Company violated section 8(a)(1), (2) and (3) of the Act by aiding and assisting Local 42 in its attempts to secure authorization cards from employees and by enforcing the union security and check-off provisions of the contract with Local 42. The Board entered the usual cease and desist and posting of notice order and affirmatively required the Company to withdraw and withhold recognition from Local 42 and to bargain upon request with Local 455. The Board also ordered the Company to reimburse all employees for dues and other sums collected under the Local 42 contract. In addition, the Board, having determined that the Company's actions converted the July 23 strike into an unfair labor practice strike on July 28, ordered it to reinstate striking employees, discharging, if necessary, persons hired since July 28. 155 N.L.R.B. 1052 (1965).

■■■ We need not tarry long over the portion of the order involving Local 42. Respondent conceded in this court that its recognition of that local violated section 8(a)(2) of the Act. That section prohibits contributing financial or other support to a union, which respondent obviously did. The Board was therefore correct in requiring respondent to cease and desist from recognizing Local 42 and prohibiting respondent from giving effect to the Local 42 contract, including enforcing the check-off.[2] Respondent contends that the order requiring reimbursement of employees for dues and other monies collected under the illegal contract with Local 42 should be enforced only vis-á-vis one employee as to whom coercion to join the union by respondent is admittedly supportable on the record. However, it was within the

2. We do not consider the question of respondent's right to contribution from Local 42.

Board's competence to conclude that reimbursement of all employees is the appropriate remedy for respondent's unlawful assistance to Local 42 on these facts.[3] See NLRB v. Cadillac Wire Corp., 290 F.2d 261 (2d Cir. 1961); NLRB v. Revere Metal Art Co., 280 F.2d 96 (2d Cir.), cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 189 (1960); cf. NLRB v. Burke Oldsmobile, Inc., 288 F.2d 14 (2d Cir. 1961).

As to Local 455, respondent does not contest those parts of the order prohibiting it from soliciting employees to abandon their membership in Local 455 or their strike, or threatening that it will not reach agreement with that local, or in any other manner interfering with the employees in the exercise of their rights under the Act; nor, apparently, does respondent in this court contest the requirement of offering reinstatement to striking employees. However, it vigorously resists the Board's finding of refusal to bargain and the consequent order to bargain with Local 455.

The Board found that the Company on and after July 28 did not confer with Local 455 in good faith "but went through the motions of negotiating with a fixed determination not to reach an agreement." This key finding, in turn, was based upon the rejection on July 28 by Getlan of proposals which had been in the expiring contract; statements of Getlan to two employees during the strike that he had no intention of reaching an agreement with the union; Getlan's willingness in August to sign whatever agreement was reached with the trade association and his having work done for him out of town at the time; Getlan's statement on August 27 that "he was through" with Local 455; and Getlan's signing up with Local 42 in September.

The difficulty with this evidence is that whatever bearing it may have on unfair labor practices occurring after July 28, it does not lend much support for finding a refusal to bargain on that date. As already noted, a strike had been voted on July 22, and began the following day. Apparently the strike resulted from the refusal of the independents, including respondent, to sign an agreement which extended the previous contract with the proviso that the new contract provisions would be retroactive. The strike was called without notice to respondent despite the failure to have serious negotiations in June and a "lack of urgency" in July. Getlan came to the July 28 meeting early as requested, settled the grievance, agreed to some terms of the new contract and rejected others, including union security and reporting pay provisions, which were in the old contract. He also made a substantial economic offer. The only aspect of this which is at all dubious is Getlan's alleged uncertainty about the legality of the union's security clause. It requires a good deal of straining—more than we think justified—to conclude from these facts that Getlan came to the bargaining table on July 28 "with a fixed determination not to reach an agreement" on that date. Indeed, both Local 455 and respondent asserted before the trial examiner that they reached agreement at that meeting. Local 455 argued from this that respondent's unwillingness to put the contract into effect was the refusal to bargain. The examiner rejected the contention that the parties had agreed, holding, in effect, the reverse—that the Company never intended to agree on that day.

The other facts relied upon by the examiner for his finding are similarly weak. All are post-July 28, and require retrospective inferences of varying extent. Thus, that respondent was having work performed for it out of town during the strike on August 4 or Getlan's desire on that date to sign whatever would be the association contract is hardly significantly probative of a "determination" on July 28 not to reach agreement with the local. Similarly, Getlan's statement on August 27 and his

---

3. At oral argument, respondent informed us that it stopped checking-off in the fall of 1965.

illegal contract in September with Local 42 may have been improper, but, in view of what had transpired since the abortive attempt to bargain on July 28, we do not think it fairly justifies a finding that Getlan was determined not to bargain on the earlier date. Finally, the examiner found that Getlan made statements to employees Gally and Schaller that he would not sign a contract; these are, of course, certainly some evidence of bad faith. But one employee was not sure whether Getlan had meant the proposed contract or any contract, and the other employee had obvious language difficulty. Both statements also were apparently made after July 28. While we do not doubt that *ad hoc* manifestations of bad faith will often lend support to a finding on state of mind antedating such expressions, we cannot characterize these as sufficient. We have been instructed to determine "[w]hether on the record as a whole there is substantial evidence to support" the Board, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 491, 71 S.Ct. 456, 464, 466, 95 L.Ed. 456 (1951). Applying this standard, we cannot uphold the Board's finding of failure to bargain on July 28.

■ Unfortunately, this does not dispose of the case. The evidence already discussed might be sufficient to support a finding of respondent's determination not to bargain sometime after July 28. Therefore, we would be tempted to disregard all of this were it not that the date might be crucial since employees were being replaced in a strike whose inception was economic only. The Board points out that employees hired during an unfair labor practice strike acquire no right to select the collective bargaining agent. Therefore, if the Board on remand again characterizes the strike as having been converted into an unfair labor strike, the exact date it became so

acquires particular significance. If the Board should decide, after a fresh view of the evidence, that respondent's determination not to deal with Local 455 did not occur until early in September—or shortly before [4]—when Local 42 was brought in, it may wish to reconsider its bargaining order and provide instead for an election—although we express no view as to that.

Order enforced in part and remanded in part in accordance with this opinion.

---

4. The General Counsel originally charged refusal to bargain on August 27. This was later amended to July 28.