**KOMATZ CONSTRUCTION, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 71–1368.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 12, 1972.

Decided April 10, 1972.

David R. Hols, St. Paul, Minn., for petitioner; Felhaber, Larson, Fenlon & Vogt, St. Paul, Minn., of counsel.

Steven C. Kahn, Atty., Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas E. Silfen, Atty., N.L.R.B., Washington, D. C., for respondent.

Before MATTHES, Chief Judge, BRIGHT, Circuit Judge, and WEBSTER, District Judge.*

MATTHES, Chief Judge.

This case is before the court on the petition of Komatz Construction Co., Inc. [Komatz] for review, and the cross application of the Board to enforce, an order of the Board to be described below. The Board's Order is reported at 191 N.L.R.B. No. 150. The circumstances giving rise to this order warrant detailed explanation.

Komatz is a highway construction contractor with home offices in St. Peter, Minnesota. The seasonal work force here involved numbered approximately 200, of whom 70–80% regularly return each season. Approximately 50 of these were truck drivers and helpers, another 50 were heavy equipment operators, and the remainder were laborers and mechanics. Prior to this controversy the drivers were represented by the Teamsters Union, Local 487, the operators by the Operating Engineers Union, AFL–CIO, and the others were nonunion employees.

The bargaining unit most particularly involved is the drivers and helpers, which first became represented by the Teamsters in 1951 pursuant to unilateral recognition by Komatz rather than by election or authorization cards. In recent years the contract has included a union security clause so that the drivers, when employed, have been active members of the Teamsters, although in the winter months they go on inactive status.

Komatz is a member of the Associated General Contractors of Minnesota [A.G.C.]. The A.G.C. acts by divisions corresponding to facets of the construction industry to negotiate contracts for its members with the various unions representing employees in that type work. The effect of these negotiations is a point of contention in this case. Komatz contends A.G.C. merely negotiates model contracts as an expedient method of bargaining and that each contractor is free to agree to the model terms or independently to negotiate further. The Board, however, found that arrangement to be binding, multi-employer bargaining.

Pursuant to notice from Local 487 that it desired to change and modify the contract which expired on December 31, 1969, negotiations began for a new contract. When the A.G.C. and the unions were unable to come to terms, there was an industry-wide strike by those unions. Only nonunion contractors and those represented by the independent Christian Labor Association [C.L.A.] commenced work in the spring of 1970. On April 10, the Teamsters came to terms with A.G.C., but honored the work stoppage until May 28, when the Operating Engineers came to terms.

Meanwhile, at least a substantial portion of Komatz' employees were as desirous as the management to get the construction season underway. This desire soon materialized into an organizational effort by C.L.A., which the Board found was unlawfully aided by Komatz. After a straw vote yielded a majority of those present favoring C.L.A., Komatz recognized C.L.A., signed a contract effective March 23, 1970 to April 30, 1972, with a union security clause covering all

* Of the Eastern District of Missouri, sitting by designation.

200 employees,[1] and resumed operations. The Teamsters subsequently filed the charges resulting in the order now under review.

Concurring with the Trial Examiner in all respects, the Board concluded: (1) that Komatz had assisted C.L.A.'s organization both by individual actions and by recognizing and contracting with it before it attained a majority, all in violation of § 8(a) (1) and (2); (2) that the Teamsters Union had continued to retain its majority and its status as the exclusive representative in this unit, so that Komatz' refusal to recognize and bargain with it violated § 8(a) (5) and (1); and (3) that the A.G.C. negotiations constituted binding, multi-employer collective bargaining so that Komatz' refusal to honor the agreement negotiated by the A.G.C. with the Teamsters also violated § 8(a) (5) and (1).[2]

The Board's order directed Komatz to cease and desist recognizing and contracting with C.L.A. unless and until that union shall have been certified as representative of Komatz' employees by the Board and to cease and desist refusing to recognize and bargain collectively with the Teamsters as the exclusive representative of Komatz' drivers and helpers. The affirmative part of the remedy required Komatz: (1) to withdraw and withhold all recognition of C.L.A. as the collective bargaining representative of its employees and to refund to the employees covered by Komatz' contract with C.L.A. all union dues and fees withheld from their wages on or after April 20, 1970; (2) to sign forthwith the collective bargaining agreement negotiated by the A.G.C. with the Teamsters, effective April 6, 1970 through April 30, 1972, to give retroactive effect to the terms and conditions in that agreement, and to make its employees whole for any losses they may have suffered by reason of Komatz' refusal to execute and comply with the terms of that A.G.C. contract; and (3) to post appropriate notices.

I.

*The Order to Sign the A.G.C. Negotiated Contract*

In the interests of clarity, we turn first to that portion of the Board's order which, seeking to remedy the failure both to recognize the Teamsters and to sign the A.G.C. contract, ordered Komatz to sign the A.G.C. contract. Since this remedy rests on the finding that Komatz had delegated binding authority to A.G.C. to negotiate for it, our consideration begins with the question whether that finding is supported by substantial evidence because, if it is not, the unenforceability of this part of the order will be unaffected by the question whether the Teamsters retained their majority.

1. The union security clause provided in pertinent part:
   "All employees covered by this Agreement, exclusive of . . . Students hired for work during their vacation period, shall within not more than thirty-one (31) calendar days after beginning employment . . . join the Union and remain members in good standing thereof while in the employ of the Company; provided, however, that any Employee who has conscientious objection to membership in the Union, and who within the [prescribed period] . . . provides the Employer and the Union with a written statement to such effect shall not be obligated to join the Union, but shall be required to pay an initial amount equal to the Union initiation fee, and a monthly amount equal to the monthly Union dues, to a recognized charity of his choice. Such monthly amounts may be deducted from such employee's pay in the same manner as provided for in the Agreement concerning Union dues . . . ."

   At the hearing before the Trial Examiner, counsel for Komatz stipulated "that the union security and dues checkoff clauses were enforced." App. 63.

2. Although the complaint did not specifically allege that C.L.A. had committed an unfair labor practice, C.L.A. participated in the plenary hearing before the Trial Examiner and its attorney stated in the preliminary colloquy: "I will state for the record that the position of the party to the contract is the same position which is taken by the respondent or the charged party, Komatz Construction." App. 53.

■ We think it is clear that the record as a whole does not support the finding that A.G.C. was delegated unequivocal authority to bind its members and thus we decline to enforce the order requiring Komatz to sign the contract.

■ As the parties concede, the test for determining whether an employer has delegated to a multi-employer unit authority both to negotiate for it and to bind it by group action is as follows:

> "[T]he test to be applied in determining the status of a multi-employer unit is 'whether the members of the group have indicated from the outset an unequivocal intention to be bound in collective bargaining by group rather than individual action, and whether the union representing their employees has been notified of the formation of the group and the delegation of bargaining authority to it, and has assented and entered upon negotiations with the group's representative.'"

Western States Reg. Coun. No. 3, Int'l Woodworkers v. N.L.R.B., 130 U.S.App. D.C. 176, 398 F.2d 770, 773 (1968). Accord, N.L.R.B. v. Johnson Sheet Metal, Inc., 442 F.2d 1056, 1060 (10th Cir. 1971);[3] Tennessee Prod. & Chem. Corp. v. N.L.R.B., 423 F.2d 169, 178 (6th Cir.), cert. denied, sub nom. U.M.W. v. Tennessee Prod. & Chem. Co., 400 U.S. 822, 91 S.Ct. 42, 27 L.Ed.2d 50 (1970). Cf. N.L.R.B. v. Local 210, Int'l Bro. of Teamsters, 330 F.2d 46 (2d Cir. 1964).

However, rather than an unequivocal intention to be bound by group action, the A.G.C. By-laws provide:

> "Section 3. No member of any occupational division shall be bound by any collective bargaining agreement negotiated by this association, or any occupational division or labor committee thereof, until such member has notified the Association of election to be so bound."

By-laws of A.G.C., Rule VII, Section 3.

the above By-law. First, the undisputed

Furthermore, the record evidences only the conclusion that the A.G.C. negotiations comport with a literal reading of testimony of both the Secretary-Treasurer of the Teamsters, Ray Pogue, and the Manager of A.G.C., William Gary, discloses that a committee of A.G.C. members negotiates with a committee of the various construction unions in Minnesota, but that each member of A.G.C. and each local union subsequently elects whether to be bound by the terms agreed upon by the negotiating committees. Indeed, some A.G.C. members have signed in some years and refused to sign in others. This is quite different from the group action implicit in multi-member bargaining where each constituent agrees beforehand to be bound by the decision of a portion, usually a majority, of the group. Second, both Pogue and Gary also testified that the Teamsters not only understood the foregoing to be the extent of A.G.C.'s authority, but in fact had demanded, each time contracts expired, that the A.G.C. members change their policy and consent to act as a group by majority rule through the A.G.C. Surely such a demand would be unnecessary if the Board's finding were correct. Third, Gary testified, and Pogue reluctantly gave a tacit concession, that A.G.C. has members whose workers are nonunion or represented by the C.L.A. Such an arrangement undercuts the Board's view that mere membership in A.G.C. operates, via its By-laws, as a delegation of authority to the A.G.C. and agreement to abide by the group action thereof.

To sustain its position the Board relies upon: (1) its interpretation of Sections 1 and 2 of A.G.C.'s By-laws; (2) Komatz' signing of the A.G.C.-negotiated contracts in previous years; (3) the provision in the A.G.C.-negotiated contract of a "most favored nation clause;" and (4) the statement made by Henry Komatz to Teamsters' representatives that "Our contracts are being

---

3. The 10th Circuit's opinion in *Johnson* was written by Judge Adams of the 3rd Circuit for a panel which included Mr. Justice Clark.

negotiated by the A.G.C. We don't have anything to do with it." We conclude, however, when these matters are considered in light of the facts previously mentioned, the Board's finding must fall for lack of substantial evidence.

Rule VII, Section 1 of the A.G.C. By-laws merely says the authority of A.G.C. *"may* extend to the agreement upon and execution of collective bargaining contracts [for] . . . such of the members . . . as *may* from time to time *authorize* the same to be done." (Emphasis supplied.) It does not say A.G.C. membership constitutes such authorization. Similarly, Rule VII, Section 2 merely says a two-thirds vote of the membership is "a condition precedent to the exercise of *any* authority by the respective labor committees. . . ." (Emphasis supplied.) It does not delineate what authority is delegated by any such vote. As the previous discussion has shown, it is Section 3 which limits the authority to negotiating, with the decision to be bound being left to each company. The "most favored nation clause" is not evidence to the contrary. It merely induces members to sign A.G.C.-negotiated terms by entitling signatories to reopen bargaining if a signatory union gives another company better terms. That is in no way evidence that each signer agreed in advance to accept the terms a majority of the A.G.C. members might approve. Accordingly, the finding Komatz delegated binding authority to the A.G.C. cannot rest merely on its membership in A.G.C. Evidence of an explicit act of such delegation is required.

We think neither the fact Komatz signed previous contracts which A.G.C. had negotiated nor Henry Komatz' statement to the Teamsters evidences an independent act "unequivocally indicating" such a delegation. If, as the other evidence shows, A.G.C. members individually decide whether to accept the terms A.G.C. arranges, then accepting those terms in prior years does not support the Board's finding. Similarly, if, as the evidence shows, the Teamsters were

aware that the scope of the A.G.C.'s power was limited as shown above, Mr. Komatz' offhand remark surely would not indicate a reversal of Section 3 of the A.G.C. By-laws which had governed the current, as well as prior, negotiations.

In sum, we conclude that when the evidence is accorded appropriate consideration, it is not sufficiently substantial to support the Board's finding that the A.G.C. membership was a multi-employer bargaining unit whose contract negotiations automatically bound Komatz. We therefore decline to enforce that portion of the Board's order enumerated as 2(b) and (c) and that portion of the notice required by paragraphs 1 and 2 of 2(f).

## II

### *The § 8(a) (1) and (2) Violation*

■ Recognition of a union which does not represent a majority of the employees violates § 8(a) (1) by impairing the employees' § 7 rights to choose their own representative and violates § 8(a) (2) by giving support to such a union. International Ladies' Garment Workers' Union v. N.L.R.B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). We therefore turn to the question whether C.L.A. represented a majority of the workers, either in the unit of drivers or in the entire workforce, because if the Board was correct in finding it did not, a consideration of the alleged individual acts of support can and will be pretermitted.

■■ Komatz' contention that C.L.A. represented a majority of its workers rests on two facts: first, that several employees repeatedly registered vociferous opposition to the Teamsters' work stoppage; and second that the employees attending the safety meeting on April 27, 1970, voted 42–15 for affiliation with C.L.A. Clearly the evidence supports the Board's finding that C.L.A. had not yet proven majority status. Dissatisfaction with a strike does not sufficiently prove dissatisfaction with the incumbent union. N.L.R.B. v. Easton Packing Co., 437 F.2d 811, 814 (3rd Cir. 1971). Similarly a

42–15° favorable vote does not prove majority support among 200 employees; and since all 200 were invited to the meeting where this balloting occurred and there is no evidence indicating how many attending were drivers, operators, or laborers, respectively, the vote doesn't even prove majority status in any one of the three categories of employees. It follows that the Board's finding a violation of § 8(a) (1) and (2) in the recognition of C.L.A. is supported by the record[4] and that its order to withdraw recognition of and bargaining with C.L.A. until that union is duly certified by the Board, and to post paragraphs 4–6 of the prescribed notice, should be enforced. However, the propriety of ordering a refund of dues in this type case is a matter of much controversy.

■■ In the present posture of the case, the question is whether the so-called *Brown-Olds* remedy[5] is appropriate where the violation consists solely of mistakenly recognizing an insurgent union which has yet to attain majority support. Since the decisive consideration is whether the employees were coerced to join the union and pay dues which "would not have been taken from them if the Company had not contravened the Act," Virginia Elec. & Power Co. v. N.L.R.B., 319 U.S. 533, 544, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568 (1943), we think it sufficient that this unlawful contract coerced the payment of either C.L.A. dues or the equivalent amount to charity—a clause Komatz stipulates was enforced by checkoff. The unfair labor practice thus produced a contract which coerced the payments, and reimbursement of them is therefore appropriate.[6] Local Lodge No. 1424, Int'l Assoc. Machinists v. N.L.R.B., 105 U.S.App.D.C. 102, 264 F.2d 575 (1959) rev'd on other grounds, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960); N.L.R.B. v. Broderick Wood Prod. Co., 261

---

4. Since the prehire provisions of § 8(f) were intended to apply "where the parties were attempting to establish a bargaining relationship for the first time," Bricklayers & Masons Int'l Union, Local No. 3, 162 N.L.R.B. 476, 65 L.R.R.M. 1085, 1086 (1966), it could be argued that section validates this C.L.A. contract despite the absence of majority support. However, § 8(f) does not exempt all first contracts in the construction industry from the other provisions of the Act. "[T]he entire legislative history of 8(f) (1) is couched in terms of 'pre-hire agreements', a reference which can have no meaning in the situation where, as here, . . . employees have previously been hired." Id. § 8(f) simply has no application to a representation dispute between an insurgent and an incumbent union.

5. United Assoc. Plumbing and Pipefitting, Local 321 (Brown-Olds Plumbing & Heating Corp.), 115 N.L.R.B. 594, 37 L.R.R.M. 1360 (1956).

6. We are cognizant of the cases denying enforcement to blanket reimbursement orders such as the one here under review and requiring proof of overt coercion as to each employee reimbursed. However, we think those cases are factually distinguishable. That approach is proper where the contract does not contain a union security clause, N.L.R.B. v. Shedd-Brown Mfg. Co., 213 F.2d 163, 170–71 (7th Cir. 1954), or where the employees voluntarily joined a union hiring hall before the company unlawfully agreed to a closed shop with it. Local 60, United Bro. Carpenters v. N.L.R.B., 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961); N.L.R.B. v. United States Steel Corp. (Amer. Bridge Div.), 278 F.2d 896 (3rd Cir.1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961); Morrison-Knudson Co., Inc. v. N.L.R.B., 276 F.2d 63 (9th Cir. 1960), cert. denied, sub nom. N.L.R.B. v Hod Carriers Union, Local No. 324, 366 U.S. 910, 81 S.Ct. 1082, 6 L. Ed.2d 233 (1961). In those cases the essential element, coercion, is missing. The unfair labor practice has not coerced everyone to join the union and pay dues, so reimbursement is properly limited to those as to whom coercion can be proven. In the present case, however, the security clause coerces all Komatz' employees to join an illegally recognized union, and that mandates reimbursement. In our view, the additional factor in *Virginia Electric* that the union was company dominated is not of decisive importance here. N.L.R.B. v. Revere Metal Art Co., 280 F.2d 96, 101 (2d Cir.), cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 189 (1960). *Contra*, Paul M. O'Neil Int'l Det. Agency, Inc. v. N.L.R.B., 280 F.2d 936, 948 (3rd Cir. 1960).

F.2d 548 (10th Cir. 1957). Cf. N.L.R.B. v. Parker Bros. & Co., Inc., 209 F.2d 278 (5th Cir. 1954). *Compare,* N.L.R.B. v. Getlan Iron Works, Inc., 377 F.2d 894, 896–897 (2d Cir. 1967) and N.L.R.B. v. Local 294, Int'l Bro. Teamsters, 279 F.2d 83 (2d Cir. 1960) *with* N.L.R.B. v. Burke Oldsmobile, Inc.,[7] 288 F.2d 14, 16 (2d Cir. 1961) and N.L.R.B. v. Masters-Lake Success, Inc., 287 F.2d 35 (2d Cir. 1961). *Contra,* Intalco Aluminum Corp. v. N.L.R.B., 417 F.2d 36, 40–43 (9th Cir. 1969).[8]

However, it does not follow that the Board has appropriately fashioned that remedy to fit this case. First, since coercion of the payment is the essential element, it is entirely inappropriate to order reimbursement to persons who voluntarily joined C.L.A. before the contract was signed. The order should therefore be modified to limit payment of checked-off dues only to those who joined C.L.A. after the contract was signed. N.L.R.B. v. Jan Power, Inc., 421 F.2d 1058, 1064 (9th Cir. 1970); N.L.R.B. v. Revere Metal Art Co., 280 F.2d 96 (2d Cir.) cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 189 (1960).

■ Second, we think it inappropriate on the facts of this case to require Komatz to bear the entire burden of reimbursement when C.L.A. is equally responsible for the coercive violation on which the order rests. As we have seen, C.L.A. aligned itself with Komatz in the hearing. Manifestly it desired to become the recognized bargaining agent for all of the employees. "When the Board has found an 8(a) (2) violation by an employer, such finding may also support an 8(b) (1) (A) charge against the union [for] . . . entering into an illegal contract with the employer. . . ."

The Developing Labor Law 136, Morris, ed.; and, "the courts have repeatedly held that the Board may impose joint and several liability on both the employer and union for reimbursement of fees and dues when each participated in the discriminatory activity." N.L.R.B. v. Broderick Wood Prod. Co., 261 F.2d at 559. The question then is whether the foregoing joint liability which the Board has been *permitted* to fashion can, in certain situations, also mark the limits of the *Brown-Olds* remedy. We think that question requires an affirmative answer.

■ We are not unmindful that "the relation of remedy to policy is peculiarly a matter for administrative competence" and that the "Act does not create rights for individuals which must be vindicated according to a rigid scheme of remedies." Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). Nor can we neglect that the order should stand unless it "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Elec. & Power Co. v. N.L.R.B., 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). However, while these statements construct an expansive view of the Board's prerogatives in fashioning remedies they also state its limitation: the order must be designed to effectuate the policies of the Act. An order that is punitive rather than remedial is impermissible, Republic Steel Corp. v. N.L.R.B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), and the Board therefore may not "apply a remedy it has worked out on the basis of experience, without regard to circumstances which may make its application to a

7. *Burke Oldsmobile* also involved a union security agreement. *See,* 46 L.R.R.M. 1267.

8. In *Intalco,* the court declined enforcement principally because the Supreme Court in *Garment Workers* said that in that case (a good faith recognition of a minority union) "[n]o further penalty results" other than a cease and desist

order. However, in *Garment Workers* there was no order to reimburse, and, more importantly, the contract did not contain a union shop clause. *See* note 6, *supra.* The Ninth Circuit also said that unless the union is a house organ as in *Virginia Electric,* the order is penal rather than remedial except as to individuals shown to have been coerced. *But see,* note 6, *supra.*

particular situation oppressive. . . ." N.L.R.B. v. Seven-Up Bottling Co., Inc., 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953). We believe that placing on only one of two wrongdoers the entire burden of remedying a situation jointly created is an oppressive, punitive order which should not be enforced. To be sure such an order would deter such acts by employers, but, "[t]hat argument proves too much" for it seeks to justify the order because of, rather than in spite of, its penal aspects. Republic Steel Corp., 311 U.S., at 12, 61 S.Ct. 77.

■ Moreover, the "jurisdiction to review the orders of the Labor Relations Board is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." Ford Motor Co. v. N.L.R.B., 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939). And, "since the powers conferred on courts of appeal by the Act are equitable in nature, they 'may be invoked only if the relief sought is consistent with the principles of equity.'" N.L.R.B. v. American Dredging Co., 276 F.2d 286, 288 (3d Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961).

In sum, we believe reimbursement to be an appropriate remedy for this violation, and, as modified to exempt those dues not coerced, it would be enforceable had it imposed some of the liability upon C.L.A. However, we hold it inequitable and oppressive to impose the entire liability upon Komatz. But rather than deny enforcement, we conclude this case is a proper one for the court to "adjust its relief to the exigencies of the case in accordance with . . . equitable principles. . . ." Ford Motor Co., *supra*. Accordingly, we grant enforcement of the reimbursement order, as modified, upon the condition that the Board, after appropriate proceedings, apportion some of the liability to C.L.A. *Cf.* N.L.R.B. v.

Local 138, Int'l Union of Oper. Eng'rs, 293 F.2d 187 (2d Cir. 1961) (modifying order of joint liability for backpay to make the union, the "prime wrongdoer", primarily liable and the employer only secondarily liable). *See also* Hughes & Hatcher, Inc., v. N.L.R.B., 393 F.2d 557, 567–568 (6th Cir. 1968).

### III

### *The Order to Cease Nonrecognition of the Teamsters*

Although the Board did not as a part of the remedy explicitly direct Komatz to recognize and bargain collectively with the Teamsters, this result flows from the Board's order to cease and desist refusing to bargain. So viewed, the validity of this aspect of the Board's cease and desist order should be resolved.

It is abundantly clear from an analysis of the entire record, particularly the Examiner's decision adopted in toto by the Board, that from the beginning this controversy has been focused upon the status of Teamsters as to the drivers and helpers. That union asserted that during the critical period (after its last contract expired on December 31, 1966) it was the sole and exclusive bargaining representative for the employees it had previously represented. Quite obviously the Teamsters' position was predicated upon the presumption that representative status continues where a union has been certified and has been the bargaining unit for more than one year, *see* Brooks v. N.L.R.B., 348 U.S. 96, 98–104, 75 S.Ct. 176, 99 L.Ed. 125 (1954) ; N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1090–1091 (8th Cir. 1969), and it is readily apparent that the Board adopted the Teamsters' position in entering that part of its order now under scrutiny.

We therefore proceed to an analysis of the relevant facts and applicable law for the purpose of deciding whether this portion of the order is entitled to enforcement.

■ Unlike an initial organizational campaign, in which the union must

present "convincing evidence of majority support" sufficient to exclude "any bona fide dispute as to the existence of the required majority of eligible employees . . .," N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 596–597, 89 S.Ct. 1918, 1931, 23 L.Ed.2d 547 (1969), a prima facie showing of majority support is made by the mere fact of a union's incumbency. *See, Brooks* and *Little Rock Downtowner, supra.* However, that presumption is rebuttable. In view of the demise in *Gissel Packing* of the subjective test of an employer's good faith doubt, 395 U.S. at 608, 89 S.Ct. 1918, the proper test for rebuttal of the presumption is whether there is objective evidence sufficient to warrant a good faith doubt of the union's majority, i. e., "a 'rational basis in fact' . . . casting 'serious doubt on the union's majority status.'" N.L.R.B. v. Frick Co., 423 F. 2d 1327, 1331 (3rd Cir. 1970).

■ Here, the Board's finding rests solely on the presumption of continuing support. There is no independent evidence in the record that any Komatz employee continued his allegiance to the Teamsters. Arrayed against this is the proof of employee dissatisfaction with the strike and the 42–15 vote for affiliation with the C.L.A. While, as we have held, this evidence is not the requisite "convincing" proof that C.L.A. had attained a majority, it is sufficient to cast a serious doubt whether the Teamsters had retained a majority. Accordingly, since we are not convinced that this portion of the Board's order is supported by substantial evidence on the whole record, we are not inclined to grant enforcement.

CONCLUSION

In sum, we enforce the order insofar as it requires Komatz to withdraw recognition from C.L.A. until it has been properly certified, to rescind the C.L.A. contract, to post paragraphs 4–6 of the notice described in the order, and to cease and desist the § 8(a) (1) and (2) violations. We modify the order to reimburse checked-off dues to limit re-funding to those persons joining C.L.A. after the contract was signed and, as modified, that portion of the order is enforced on the condition that the Board take appropriate action to apportion part of the liability to C.L.A. In all other respects enforcement of the Board's order is denied. The cost of printing the Appendix shall be taxed equally against the petitioner, Komatz Construction, Inc., and the National Labor Relations Board. Each of the parties shall bear the remainder of its own costs.