CUYAHOGA WRECKING CORPORATION and Jordan & Foster Scrap Corporation, Plaintiffs,

v.

LABORERS INTERNATIONAL UNION OF NORTH AMERICA, LOCAL UNION # 210, Defendant.

No. CIV–85–416E.

United States District Court, W.D. New York.

Sept. 26, 1986.

James N. Schmit, Buffalo, N.Y., for plaintiffs.

Richard Wyssling, Buffalo, N.Y., for defendant.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

A motion has been made to this Court by plaintiffs, Cuyahoga Wrecking Corp. ("CWC") and Jordan & Foster Scrap Corp. ("Jordan & Foster") to enjoin any and all arbitration between themselves and the defendant union arising out of collective bargaining agreements covering the periods from June 1, 1981 through May 31, 1984 and June 1, 1984 through May 31, 1987.

Jurisdiction to enjoin arbitration pursuant to a collective bargaining agreement is conferred upon this Court by section 301 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 185.

Defendant Laborers International Union of North America, Local Union No. 210 ("Local 210") is a "labor organization" as defined by 29 U.S.C. § 152(5). It represents members of Laborers International working in the western area of New York. Local 210 entered into a collective bargaining agreement with the Independent Contractors Association of Western New York, Inc. ("the ICA"), a multi-employer association incorporated to promote the interests of construction contractors. The agreement was effective June 1, 1981 through May 31, 1984 ("Agreement 1"). At the time Agreement 1 was entered into, CWC was not a member of the ICA. When CWC, an Illinois Corporation, contracted to perform a demolition job for the Buffalo Urban Renewal Agency late in 1981, it was required to employ union labor to work on that project. About November 1981 CWC executed a copy of Agreement 1 which had previously been negotiated between Local

210 and ICA. CWC worked on the Buffalo project until June 1982, during which time it complied with all applicable aspects of the agreement. From the time that project ended until after Agreement 1 had terminated, CWC did not directly engage in any demolition work within western New York. Its next project in that area was for Bethlehem Steel in Lackawanna in August 1984.

In June 1983, after CWC had become signatory to Agreement 1, Jordan & Foster was incorporated under the laws of New York. Jordan & Foster's first job performing demolition work was as a subcontractor of CWC, at the site of the former Hanna Furnace Co., which property was then, and is still, owned by Jordan & Foster. In September of 1984 Jordan & Foster began a job working as a subcontractor for CWC at the Bethlehem Steel site in Lackawanna.

Local 210 now contends that the Hanna Furnace job done by Jordan & Foster's non-union labor violated Agreement 1, signed by CWC, because Jordan & Foster and CWC were in fact a "single employer" and therefore each was bound by the terms and conditions of Agreement 1.

Local 210 further contends that CWC, by signing Agreement 1 became a member of the ICA and was bound pursuant to ICA's bylaws, Article III, § 2, by any subsequent agreements negotiated between ICA and Local 210. Prior to the expiration date of Agreement 1 (May 31, 1984), a new contract was successfully negotiated between ICA and Local 210, which became effective June 1, 1984 through May 31, 1987 ("Agreement 2"). It is not disputed that both CWC and Jordan & Foster have engaged in demolition work in western New York while Agreement 2 was in effect; Local 210 therefore claims violation of this contract also.

The agreements contain virtually identical Grievances and Arbitration clauses, pursuant to which the defendant demanded that the disputes be submitted to arbitration. The plaintiffs have moved in this Court for a preliminary injunction to stay such action. The parties, who have other and related labor disputes pending before this Court, subsequently agreed to move ahead to the question of a permanent injunction. An evidentiary hearing was held in December 1985, and the parties have submitted proposed findings and conclusions.

Section 8(d)(1) of the NLRA, 29 U.S.C. § 158(d)(1), requires one seeking to terminate or modify a collective bargaining agreement to serve written notice upon the other party of his intention to terminate or modify, sixty days before the expiration of the agreement. CWC failed to give either the sixty-day notice of termination required by the NLRA, or the 120–day notice required by section 2 of Article III of the ICA bylaws. This fact is of no significance, however, unless and until it is determined that CWC had become and been a member of the ICA.

There is sharply conflicting testimony regarding CWC's intent to become a member of the ICA when it executed a copy of Agreement 1. CWC supervisor Samuel Runfola stated that Agreement 1 was signed without any discussion, primarily because union labor was a mandatory condition of the Buffalo Project. Record at 2–123. Local 210's business manager, Ronald Fino, testified to the contrary—to wit, that Runfola was familiar with multi-employer associations, that the contracts of several others besides ICA were described to him, and that he had been offered the option of signing an independent contract with Local 210. Record ("R") at 4–9 to 4–15.

The test of whether an employer can be held to the terms of a contract negotiated by a multi employer organization is stringent; the employer must indicate from the outset a clear and unequivocal intention to be bound by group action. *Raun Transport Corp.* 234 N.L.R.B. 241, 97 LLRM 1195 (1978). The unequivocal commitment to be bound language was subsequently approved in a concurring opinion in *Charles D. Bonanno Linen Service v. NLRB*, 454 U.S. 404, 420, 102 S.Ct. 720, 729, 70 L.Ed.2d 656 (1982) (Stevens, J., concurring). *See also Crane Sheet Metal,*

*Inc. v. N.L.R.B.*, 675 F.2d 256, 258 (10th Cir.1982).

The mere hiring of union members and paying them in compliance with a new collective bargaining agreement that the association had negotiated with the union does not necessitate a finding that a non-signatory employer had manifested its intent to be bound by the new agreement. *O'Connor Company, Inc. v. Carpenters Local Union No. 1408,* 702 F.2d 824, 825–826 (9th Cir.1983).[1] An employer who merely adopts a collective bargaining agreement, in the negotiation of which he did not participate directly or by delegation of authority, does not, as a general rule become part of a multi employer bargaining group. *Raun Transport Corp., supra.* The employer in such case maintained that it could not be held to a second agreement signed by a union and a multi-employer bargaining organization, simply because it had signed a previous one. The Board agreed. Such act had not made it a member of the organization, and it had not participated in negotiating either the old or the new agreement, and it had not expressly authorized the organization to bargain for it. Even a provision in the executed agreement whereby the employers "acknowledge that they are part of a multi-employer collective bargaining unit" was found by the Board in that case to be at best a "bare covenant" which would not suffice to *clearly* and *unequivocally* show that an employer had delegated its authority to the organization. *Raun Transport Corp., supra* at 1197.

In the instant case, the entire argument for finding that CWC became a member of the ICA lies in the fact that it signed an agreement between ICA and Local 210.

And although multi-employer bargaining has been encouraged as "a vital factor in the effectuation of the national policy of promoting labor peace," *Labor Board v. Truck Drivers Union,* 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957), it is beyond dispute that a party can not be held to a contract to which it never agreed. CWC never requested or completed a membership application from the ICA, although "in order to become a member * * * [one] must do so in writing on a form provided by Independent Contractors of Western New York, Inc." ICA bylaws, Article III, § 3. Mr. Eugene Principe, director of labor relations of the ICA, testified that the procedure as set out in the bylaws had never been followed. Prospective members' names are sent on a form directly from Local 210 to the ICA. The ICA then determined whether it would guarantee payment of contributions. ICA sent acknowledgement to Local 210 that it would guarantee such payments, then added CWC to its list of members. R at 2–270 to 2–278. Thus, no direct communication ever took place between CWC and ICA during the "application process."

None of this evinces a clear and unequivocal intent by CWC to be bound by further agreements negotiated by the ICA. Local 210 does not contest that CWC neither attended ICA meetings nor contributed in any way in the negotiations which produced Agreement 1 or 2. CWC in fact refused to sign Agreement 2. Furthermore, outside of Agreement 1, it appears that CWC never executed any document whatsoever to which ICA was a party.

Consequently, this Court finds that CWC never became a member of ICA; it can therefore be bound only by the terms of the contract which it actually signed,

**1.** Even payment of an association membership fee is not determinative, inasmuch as membership in an association does not, of itself, confer authority to the group to negotiate on the individual's behalf. *Crane Sheet Metal, Inc. v. N.L.R.B., supra,* at 259 (the association in that case granted each employer final authority to approve any contract negotiated for it). The United States Court of Appeals for the Eighth Circuit agreed that actual membership in an association is not necessarily determinative of an employer's duty to abide by the terms of a collective bargaining agreement, provided there is a basis for finding that the express delegation of authority required by *Raun Transport Corp., supra,* is missing. *Komatz Construction, Inc. v. N.L.R.B.,* 458 F.2d 317, 321 (8th Cir.1972) (bylaws provided that association's members must so elect in order to be bound by any collective bargaining agreements).

Agreement 1, which expired May 31, 1984. Neither the ICA bylaws nor the NLRA mandate concerning termination is applicable.

This Court further finds that at no time during the period in which Agreement 1 was in effect did CWC itself act in contravention of its terms. The question remains whether the acts of Jordan & Foster can be attributed to CWC, so that an arbitrable dispute may be found to have arisen under the collective bargaining agreement.[2]

Where a company which is a signatory to a valid collective bargaining agreement establishes a second company which is non-union and it is shown that the companies are a "single employer" within the meaning of the NLRA and that their combined employees form an appropriate bargaining unit, both will be held to the terms and conditions of the collective bargaining agreement. *N.L.R.B. v. Al Bryant Inc.*, 711 F.2d 543, 550 (3d Cir.1983). The National Labor Relations Board ("the Board") has established controlling criteria for determining if two entities are in fact a "single employer". These criteria are: interrelation of operations, common management, centralized control of labor relations and common ownership. *Radio Union v. Broadcast Serv.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965). Although an analysis under the foregoing criteria may yield a finding that a "double-breasted operation" is a single employer,[3] that employer will not be guilty of a collective bargaining violation unless the combined employees of the components of the single employer form an appropriate bargaining unit. *South Prairie Constr. v. Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48

L.Ed.2d 382 (1976); *N.L.R.B. v. Al Bryant, Inc., supra*, at 550. The focus of this latter inquiry shifts from the control, structure and ownership of the employer to the community of interests of the employees. *Peter Kiewit's Sons' Co.*, 231 N.L.R.B. 76, 77 (1977). To achieve the goal of creating a viable bargaining unit, factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange will be examined. *N.L.R.B. v. J.C. Penney Co., Inc.*, 559 F.2d 373, 375 (5th Cir.1977).

The tests and criteria are long-standing and well accepted. However, it is also beyond dispute that it is the Board that was given statutory authority[4] to determine bargaining units. *Confederated Independent U. v. Rockwell-Standard Co.*, 465 F.2d 1137, 1140–1141 (3d Cir.1972). When the United States Court of Appeals for the District of Columbia Circuit, in reviewing a Board decision that a double-breasted operation was not a single employer, found that the evidence did not support the Board's finding, the Court was acting within its jurisdiction. However, when that same court went on to make the initial determination concerning the appropriateness of the bargaining unit, it was reversed as having acted incompatibly with the orderly function of judicial review. *South Prairie Constr. v. Operating Engineers, supra*, at 805. *See also Labor Board v. Metropolitan Ins. Co.*, 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).

These decisions of our highest court notwithstanding, a District Court confronted with a decision similar to the one with

---

**2.** Where an injunction to prevent arbitration of a labor dispute is sought, it is not the function of the court to evaluate the merits. It is, however, its proper role to determine if the dispute is arbitrable. *Westvaco Corp. v. United Paperworkers Intern. U.*, 424 F.Supp. 250, 254 (S.D.N.Y.1976).

**3.** Two companies are said to be conducting such an operation when they, although different legal entities in the construction industry, do business separately, one on a union basis and the other on a non-union basis but with common

proprietary and managerial aspects. *N.L.R.B. v. Al Bryant, Inc., supra* at 546.

**4.** Section 9(b) of the National Labor Relations Act, 29 U.S.C. § 159(b), directs the Board to "decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit or subdivision thereof."

which this Court is faced may rule on the appropriateness of a bargaining unit comprised of the employees of the components of a single employer. It was the scope of an appellate court's judicial review which was the concern of the Supreme Court in *South Prairie Constr. v. Operating Engineers* and *Labor Board v. Metropolitan Ins. Co.* This case is immediately distinguishable in that it is the original jurisdiction of a District Court that is being sought to determine in an action, the nature of which is entirely within its purview—whether or not a collective bargaining agreement will be enforced.

The United States Court of Appeals for the Fifth Circuit dealt with this distinction convincingly and at length in *Carpenters Local U. No. 1846 v. Pratt-Farnsworth*, 690 F.2d 489 (1982), stating that in a section 301 action to enforce a labor contract, a court's duty must include all of the necessary determinations as to who the parties are. When the Board (as in both that case and the present case) has not been called upon by either party but the District Court has been petitioned, the court must act.

> "To say that the courts and not the Board are solely entitled to pass upon contractual disputes and at the same time to deny the courts the power to determine * * * the identity of the persons or entities obligated by the contract is self-contradictory." *Id.* at 518.

This reasoning has been adopted in *Intern. Union v. Superior Rigging and Erecting Co.*, 602 F.Supp. 913 (N.D.Ga.1984). *See also Serv., Etc., Emp. U. Loc. 47 v. Comm. Prop. Serv.*, 755 F.2d 499, fn. 5 (6th Cir. 1985).

There is an additional recognized theory under which an employer may be compelled to submit to arbitration through the acts of another. In *Southport Co. v. Labor Board*, 315 U.S. 100, 106, 62 S.Ct. 452, 455–56, 86 L.Ed.2d 718 (1942), it was held that, absent a *bona fide* discontinuance of operation and a true change of ownership, it would not permit a corporate employer to avoid compliance with a Board order. An employer who merely effectuates a change in name or in apparent authority will be compelled to obey prior Board directives. *Ibid.* This "disguised continuance" concept is the heart of the Board's alter ego doctrine. Factors similar to those in a single employer inquiry will be examined in deciding whether two employers may be deemed one—whether the two have substantially identical management, business purpose operation, equipment, customers supervision and ownership. *Samuel Kosoff & Sons, Inc.*, 269 N.L.R.B. 424, 428 (1984); *Garwin Corp.* 153 N.L.R.B. 664, 666 (1965). Again, each case must be determined on its own facts. In addition, an alter ego is more likely to result where the disguised continuance is motivated by an attempt to avoid the obligation of a collective bargaining agreement through a sham transaction or a technical change in operations. *N.L.R.B. v. Tricor Products, Inc.*, 636 F.2d 266, 270 (10th Cir.1980); *Carpenters Local U. No. 1846 v. Pratt-Farnsworth, supra* at 508.

The alter ego question most frequently arises in successorship situations, but has also been found in the double breasted construction cases where there is a shift of work traditionally performed by a union contractor to a substantially identical non-union firm. Indeed, transfers of work from a company with a union contract to a non-union company have been called the "common thread" connecting alter ego cases. R. Pleasure and E. Gorman, Extension of Bargaining Rights and Contracts to Single Employee and Alter Ego Entities, Institute of Labor Law, Southwest Legal Foundation, 246 (1984).

It is beyond dispute that there is a strong connection between CWC and Jordan & Foster. Various members of the Schwab family hold office and controlling shares in each of the two corporations. It is Mary Schwab who purportedly is president of Jordan & Foster, yet it was Philip B. Schwab, her husband, who signed a mortgage agreement on behalf of Jordan & Foster as its President. This same Philip B. Schwab also signed the Buffalo Urban

Renewal Agency contract and performance bonds as President of CWC.

Michael O'Brien holds the office of both Vice-President and Treasurer of Jordan & Foster, yet it is apparent from his testimony that his actual authority in either capacity is extremely limited, as is his knowledge of the financial structure and major financial dealings of Jordan & Foster. R at 2–31ff. O'Brien, originally a job supervisor at CWC was hired as Vice-President/Treasurer of Jordan & Foster by Philip Schwab, the same individual who contributed the five thousand dollars that capitalized Jordan & Foster.

It was CWC that obtained a three-year easement to remove pig iron from the Hanna Furnace site beginning in July 1983. CWC did not exercise its prior right to purchase the property, R at 39, and, later that same month, Jordan & Foster was able to buy the Hanna site with money from CWC (R at 2–97) and a four-million dollar loan guaranteed personally by Philip B. and Mary Schwab, among others. Jordan & Foster subsequently dismantled the Hanna Furnace buildings and set up a scrap yard at the site.

Jordan & Foster continues to maintain a close working relationship with CWC. Jordan & Foster is presently working as a subcontractor for CWC on the Bethlehem Steel project, dismantling and removing scrap for recycling; CWC is listed as a debtor on a U.C.C. financing statement covering equipment leased for Jordan & Foster. CWC's address on that document is c/o Jordan Foster, 1818 Fuhrman Blvd., Buffalo (the Hanna Furnace site); in November 1984, over a year after Jordan & Foster had been incorporated, O'Brien was signing correspondence to CWC subcontractors on CWC's letterhead.

The strong indication from the facts is that the Schwab family, Philip B. Schwab in particular, exercises ownership and control of both CWC and Jordan & Foster. Because CWC is in the construction business, and has previously done demolition work in the Western New York area using union labor, the creation of Jordan & Foster in fact directed work away from CWC and the union laborers it would have been obligated to hire. Anti union animus is not essential to a finding that two companies are alter egos. *Goodman Piping Products v. NLRB*, 117 LLRM 2143, 2144 (1984). Nevertheless it may be "germane." *N.L.R.B. v. Tricor Products, Inc., supra* at 270. In the instant case, no legitimate reason has been offered by the plaintiffs to counter the inference that Jordan & Foster was created to divert work from union members. Thus, the substantial identity between CWC and Jordan & Foster, together with the evasion of CWC's duty under the collective bargaining agreement provides sufficient basis for this Court to find Jordan & Foster to be the alter ego of CWC without addressing the single employer doctrine with its common bargaining unit analysis. Because of such relationship, Jordan & Foster was obligated to observe the terms and conditions of the agreement which CWC signed with the union.

Accordingly, it is hereby ORDERED that arbitration between CWC, Jordan & Foster and Local 210 regarding matters occurring after the expiration date of Agreement 1—i.e., after May 31, 1984—are permanently enjoined. The plaintiffs' motion to enjoin arbitration pursuant to Article XIV of Agreement 1, effective June 1, 1981 through May 31, 1984 is denied. The plaintiffs are hereby ORDERED to comply with Local 210's November 16, 1984 demand for arbitration to the extent that violations of Agreement 1 prior to June 1, 1984 are alleged.