TRUSTEES OF the UIU HEALTH AND WELFARE FUND and UIU Pension Trust, Plaintiffs-Appellants,

v.

NEW YORK FLAME PROOFING CO., INC., General Drapery Services, Inc., James Belmont and Upholstery Employers Association, Inc., Defendants,

New York Flame Proofing Co., Inc., and General Drapery Services, Inc., Defendants-Appellees.

No. 806, Docket 86-7972.

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1987.

Decided Sept. 8, 1987.

---

Jonathan C. Reiter, New York City (John J. Gallione, New York City, of counsel), for plaintiffs-appellants.

Robert M. Saltzstein, Lake Success, N.Y., for defendants-appellees.

Before KEARSE, WINTER and MINER, Circuit Judges.

WINTER, Circuit Judge:

This case raises the question of whether an employer is bound by a multiemployer collective bargaining agreement. We hold that an employer creates actual and thereafter apparent authority in a multiemployer organization to bind the employer when that employer: (1) joins an organization whose principal or sole activity is to negotiate collective bargaining agreements on behalf of its members, and (2) knows of a universally observed custom that such members are bound by those agreements.

The employer consists of defendants-appellees New York Flame Proofing Co., Inc., and General Drapery Services, Inc., which are a unified enterprise (hereafter "Flame Proofing") under the control of Joseph "Jim" Belmont, their president and sole shareholder. The multiemployer bargaining group is the Upholstery Employers Association, Inc. ("UEA"), which negotiates and executes on behalf of member employers collective agreements with Local 44 of the Upholsterers International Union of North America, AFL-CIO ("Local 44"). Plaintiffs-appellants are the trustees ("Trustees") of both the UIU Health and Welfare Fund and the UIU Pension Trust. The funds and the trust provide various medical, surgical, accident, pension and similar benefits to employees represented by the UIU.

In August 1985, the Trustees brought suit in the Southern District of New York, pursuant to 29 U.S.C. §§ 1132 and 1145, against Flame Proofing, Joseph Belmont and the UEA to collect allegedly delinquent contributions. Specifically, the Trustees sought to collect contributions required by an agreement executed between Flame Proofing and Local 44 for the period September 1, 1981–August 31, 1984 and by an agreement executed between the UEA and Local 44 for the period September 1, 1984–August 31, 1987.

In May 1986, Judge Sweet granted partial summary judgment in favor of the Trustees against Flame Proofing for contributions due under the 1981–84 contract, 649 F.Supp. 843. He also dismissed the complaint against Joseph Belmont individually. Neither ruling has been appealed. The Trustees and the UEA subsequently entered into a stipulation withdrawing the complaint against the UEA. A bench trial

was thereafter held on the issue of whether Flame Proofing was bound by the 1984–87 contract. Damages were stipulated to be $102,297.35.

The UEA's principal, if not sole, *raison d'être* was to negotiate on behalf of its members collective agreements with Local 44.[1] It had executed such agreements with Local 44 for at least twenty-five years. These agreements were signed by the UEA President on behalf of member employers, who were not subsequently required to execute individual agreements with Local 44. The UEA's multiemployer collective bargaining agreements also became the standard agreements for independent employers in the industry. The independents executed and returned individual copies of the contract to the union. From 1966 until 1982, Flame Proofing was an independent and executed individual agreements with Local 44.

The UEA observed few internal formalities. For example, it did not secure written authorizations from members to negotiate on their behalf. UEA's bylaws were almost entirely ignored, and it did not have formal membership meetings with minutes. UEA meetings took place at restaurants over lunch or dinner and were often attended by independents as well as by members. One formality observed by the UEA, however, was the recording of dues paid by its members. These records included payments by Flame Proofing, initialed by Belmont, for the years 1982 through 1985. The UEA compiled lists of member employers and gave them to Local 44 during contract negotiations in 1978, 1982 and 1984. Flame Proofing was on the lists for 1982 and 1984.

During the spring and summer of 1984, the UEA and Local 44 engaged in negotiations over the 1984–87 collective bargaining agreement at issue in the instant case. Members and independents were invited to these UEA meetings and were asked for their suggestions on the new contract. UEA Chief Negotiator Al Reutel testified that Belmont had stated at a UEA dinner meeting in May 1984 that he was happy with the job that the UEA was doing, and that he was with the UEA one hundred percent in the upcoming negotiations with Local 44. UEA President William Nix stated that Belmont had given his support to the UEA but that Belmont had also mentioned a "jurisdictional problem." This problem resulted from the fact that the carpenters' union claimed jurisdiction over drapery installation in new construction, and Belmont often had to hire carpenters, rather than upholsterers, to do such work.

During the summer of 1984, Belmont kept a close watch on the progress of the UEA's negotiations with Local 44. Flame Proofing employee Phil Richmond attended at least two negotiation meetings with the union. UEA negotiator Reutel also consulted with Richmond on the phone several times. On August 6, 1984, Belmont wrote UEA President Nix and noted the UEA's "good efforts" toward negotiating a reasonable contract with Local 44. Referring to the jurisdictional issue, Belmont suggested that increased wages to Local 44 were not justified because employers involved in new construction also had to employ members of the carpenters' union. Belmont concluded that, "[w]e here must seriously consider severing our relations with Local 44, even if it means manufactur-

1. The UEA's By-Laws state:
### ARTICLE I
### OBJECTS
The objects of the Association are:
1. To preserve and improve the integrity and stability of the upholstery, furniture and drapery industry of New York.
2. To acquire and disseminate for the use of members such business and scientific information as may prove of value to them.
3. To encourage the spirit of cooperation in all Workrooms and Factories by the development of interest in the work.
4. To develop interest in enterprises related to our work and incorporate our craftsmanship where possible.
5. To negotiate and execute labor contracts with the unions common to the Association members and on behalf of said members and to generally represent them in their relationship with labor.
The UEA's actual activities were limited to Object 5. For example, the dues collected appear to have been expended solely for purposes of collective bargaining.

ing our draperies across one of the two rivers surrounding us."

In late August 1984, the UEA agreed to a proposal for a final contract that provided for a wage increase and the health and welfare contributions at issue here. Richmond attended the meeting at which the agreement was reached. Local 44 ratified the proposed provisions and sent copies to all employers, members and independents. Nix executed the finalized agreement on behalf of the UEA in April 1985. Concurrently, the Union sent copies of the new collective bargaining agreement to independent employers with a form letter asking them to execute and return the document. Flame Proofing received such a letter with the contract, already signed by Mastrangelo on behalf of Local 44. Mastrangelo testified that he had sent the form letter only to independent employers. He also testified, however, that he did not sign independents' contracts until they were returned to him. As an independent, Flame Proofing's practice had been to sign the industry-wide contract when a union official contacted Belmont. In March 1985, when the firm was a UEA member, the agreement remained unsigned in its files.

Neither Flame Proofing nor the union took any steps to clarify matters. Local 44 did not send a union official to contact Flame Proofing as it had in the case of past contracts. Belmont did not contact the Union or make any effort to negotiate separately. Union officials testified that, on the basis of twenty-five years of dealing with the UEA, they believed that Flame Proofing, as a UEA member, was bound by the agreement signed by UEA's President Nix and that Belmont's signature was unnecessary. They further testified that if they had known of Flame Proofing's refusal to be bound, they would have struck that company.

The record indicates that Flame Proofing did increase the wages of all of its employees as of September 1, 1984, although the evidence at trial was unclear as to whether the increase was the same as that required by the collective bargaining agreement. Flame Proofing had about one hundred employees, about twenty of whom were members of Local 44 during the period in question. Flame Proofing continued to fill out contribution reports for the UIU Health and Welfare Fund and the UIU Pension Trust. Nevertheless, Flame Proofing did not make the requisite contributions. However, the company had also failed to make the contributions required by the 1981–84 contract it had signed as an independent.

After trial, Judge Sweet found, *inter alia,* that the UEA's "principal, if not virtually sole activity" was collective bargaining on behalf of its members; that the UEA had "consistently bargained on behalf of its members with the union" from at least the 1960's; that the practices between the UEA and Local 44 were informal; that "[a]t no time ha[d] there been any written authorization on the part of any employer to be bound by the Association"; that Flame Proofing had become a UEA member in 1982; that Belmont had attended at least one of the meetings that had preceded the UEA's 1984 negotiations with Local 44; that Belmont was aware of the progress of the contract negotiations; that Belmont's "expeditor," Richmond, had attended "a certain number" of negotiating meetings; and that Belmont's August 1984 letter to the UEA complaining about the jurisdictional problem "d[id] not constitute a resignation from the Association or a statement of not being willing to be bound."

Nevertheless, Judge Sweet stated that, "to me the critical distinction is the past history, and the only thing that contravenes that past history, that is, where Flame Proofing was not a member of the [UEA], [is] the change of circumstances in the payment of dues." He concluded that joining the UEA was not a sufficient demonstration of an unequivocal intention by Flame Proofing to be bound by the 1984–87 collective bargaining agreement. Accordingly, he entered judgment for defendants.

## DISCUSSION

The legal standards pertinent to the actual authority of a multiemployer organization to bind members are well-established.

"The test is whether the employer members of the group have indicated from the outset an unequivocal intention to be bound by group action in collective bargaining, and whether the union, being informed of the delegation of bargaining authority to the group, has assented and entered into negotiations with the group representative." *NLRB v. Beckham, Inc.,* 564 F.2d 190, 192 (5th Cir.1977); *see also Charles D. Bonanno Linen Serv., Inc. v. NLRB,* 454 U.S. 404, 419–20, 102 S.Ct. 720, 728–29, 70 L.Ed.2d 656 (1982) (Stevens, J., concurring); *NLRB v. New York Typographical Union No. 6,* 632 F.2d 171, 183–84 (2d Cir.1980). The "correlative standard" for excluding a particular employer from the group is "evidence of an intent to pursue an individual course of action with respect to labor relations." *Ruan Transp. Corp.,* 234 N.L.R.B. 241, 242 (1978) (citation omitted); *see also Komatz Constr., Inc. v. NLRB,* 458 F.2d 317, 321–22 (8th Cir.1972) (determining whether employer indicated unequivocal intention to delegate bargaining authority to multiemployer unit). Absent an unequivocal commitment to be bound by group action, "an employer is free to withdraw from group negotiation at any time, or simply to reject the terms of the final group contract." *Bonanno Linen,* 454 U.S. at 420, 102 S.Ct. at 729 (Stevens, J., concurring).

We believe that Judge Sweet's factual finding that Flame Proofing joined the UEA leads to a legal conclusion different from the one that he reached. Mere membership in an employers' association, without more, does not necessarily evidence an unequivocal intention to be bound by the collective agreements it negotiates. *See, e.g., Komatz,* 458 F.2d at 322. However, if the "principal, if not virtually sole activity" of an association is to negotiate collective bargaining agreements on behalf of its members and if the longstanding, universally observed and universally known custom is that members are bound by such agreements, acquiring membership in that organization does constitute an unequivocal statement as to its actual authority to bind the new member.

Collective bargaining on behalf of members was UEA's only concrete activity. Membership thus had no purpose other than to authorize collective bargaining on an employer's behalf. Moreover, the undisputed evidence demonstrated that UEA members, relying on more than twenty years of practice, believed themselves bound by any agreement negotiated by the UEA. There is no evidence that, until Flame Proofing's disavowal, any UEA member had ever refused to be bound by an agreement negotiated by UEA.

Flame Proofing was well aware of the consequences that reasonably flowed from its membership in the UEA. The New York upholstery industry contained only thirty firms. Industry practices were well established. Flame Proofing was not a newcomer to the industry and had signed six contracts as an independent with Local 44 over eighteen years. Flame Proofing knew the critical distinction between membership and independent status in the upholstery industry and also knew that, once it became a member, the UEA would represent to Local 44 that it had authority to bargain on behalf of Flame Proofing.

This brings us to the question of whether Flame Proofing's expression of concerns over the "jurisdictional issue," or other acts subsequent to becoming a UEA member, limited the UEA's authority. The "unequivocal intention" test does not render other rules of the law of agency, and in particular the doctrine of apparent authority, inapplicable. *See NLRB v. Johnson Sheet Metal, Inc.,* 442 F.2d 1056, 1060 (10th Cir.1971) (employers bound by doctrine of apparent authority to contract proposals beyond the scope of agent's actual authority).

The doctrine of apparent authority comes into play when a party, here Local 44, reasonably believes that another party, here Flame Proofing, has delegated authority to enter into an agreement on its behalf to an agent, here the UEA. *See Beckham,* 564 F.2d at 194 (analyzing apparent authority from viewpoint of union); *Restatement (Second) of Agency* § 8 comment c (1958) ("Apparent authority exists only to the ex-

tent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized."). Of course, the acts that create the appearance of actual authority must be acts of the principal, not those of the agent. The employer association cannot confer apparent authority upon itself; the authority of an agent "can only be established by tracing it to its source in some word or act of the alleged principal." *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir.1978) (quoting 1 Mechem, *Agency* § 285, at 205 (1914 ed.)); *see also Restatement (Second) of Agency* § 27 comment a.

By joining the UEA, Flame Proofing authorized the association to bargain on its behalf and to inform Local 44 of that authority. Flame Proofing's membership in the UEA justified the union's reliance on the established practice regarding the UEA's authority to bind members. Once the fact of membership was communicated to Local 44, therefore, Flame Proofing's private equivocations would not suffice to deprive the UEA of at least apparent authority. Thereafter, only a communication from Flame Proofing to Local 44 withdrawing authority would avoid the binding effects of the UEA's negotiations. Flame Proofing's expression of doubts or equivocations in the course of the UEA's internal deliberations are thus of no consequence.

Reversed. The case is remanded for entry of the appropriate judgment for damages.