Thomas MORIARTY, etc., Plaintiffs,

v.

**GLUECKERT FUNERAL HOME, LTD., Defendant.**

No. 95 C 2848.

United States District Court,
N.D. Illinois,
Eastern Division.

June 16, 1997.

Karen I. Engelardt, Robert S. Bates, Jr., Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for Plaintiffs.

Catherine P. Wassberg, Alex V. Barbour, Jenner & Block, Chicago, IL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

Following a bench trial in this ERISA-based action, counsel for the litigants tendered their respective revised sets of proposed findings of fact ("Findings") and conclusions of law ("Conclusions") for consideration by this Court. In accordance with Fed.R.Civ.P. 52(a), what are set out here will constitute this Court's Findings and Conclusions. To the extent (if any) that the Findings as stated may be

deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

## Findings of Fact

1. Thomas J. Moriarty ("Moriarty") is a Trustee and a fiduciary of the International Brotherhood of Teamsters ("Teamsters") Local Union No. 727 Health and Welfare Trust and its Pension Trust (collectively "Funds"). Both Funds are "employee benefit plans" within the meaning of Employee Retirement Income Security Act of 1974 as amended ("ERISA") § 1002(3).[1] As a fiduciary of an employee benefit plan, Moriarty is authorized to commence a civil action under ERISA § 1132(a)(3) to enforce the obligations that ERISA imposes upon employers (Fact ¶ 2;[2] D. Ans. ¶ 4).

2. Funds are third-party beneficiaries of collective bargaining agreements ("CBAs") entered into between the Funeral Directors Services Association of Greater Chicago ("Association") and the Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash

Rack Attendants Union, Local No. 727 of the Teamsters ("Union") (Fact ¶ 1).

3. Moriarty began his employment with Association's predecessor in 1950 as an accountant and office manager (Tr. 26). In 1960 Moriarty became Association's Executive Director, and he held that position until December 31, 1993 (Fact ¶ 2). Moriarty then remained employed by Association as a consultant between January 1, 1994 and December 1995 (Tr. 27). Since 1963 Moriarty has served, and he continues to serve, as Trustee of the Health and Welfare Trust, and since 1964 Moriarty has served, and he continues to serve, as Trustee of the Pension Trust (Tr. 25).

4. Association is a multiemployer association that comprises, and that represents, approximately 250 members (Fact ¶ 6). Association and its predecessor organizations have represented employers in the Chicago metropolitan area funeral home industry in collective bargaining negotiations with Union since approximately 1915 (Tr. 28). Association's activities include but are not limited to negotiating labor contracts, representing employers in labor matters, participating in group insurance programs, educational programs and social programs and seminar tours, and obtaining copies of death certificates for its members (Tr. 29).

5. Although it is neither useful nor critical to determine the principal activity in which Association engages,[3] it cannot be

1. Citations to ERISA will take the form "ERISA § —," referring to the section numbering in 29 U.S.C. rather than to ERISA's internal numbering.

2. "Fact ¶—" refers to the parties' joint statement of uncontested facts in the Final Pretrial Order ("FPTO").

3. Moriarty's counsel has sought to argue that Association's collective bargaining and other labor activities fit that description, but it is unnecessary to this litigation to make such a finding. Indeed, the Findings by this Court's colleague Honorable Elaine Bucklo in another action brought by Funds, *Moriarty v. Modell Funeral Home, Ltd.*, 960 F.Supp. 133, 134–36 (N.D.Ill. 1997) not only reach a contrary conclusion but also point to the absence of any reference to collective bargaining in Association's promotional literature describing its services—an absence that is also reflected by the record in this case.

It may be that Association has viewed it as so much a given that multiemployer associations in industries that employ people in trades that are often (or always) unionized will typically engage in the negotiation and execution of CBAs on behalf of their employer-members that it was unnecessary to make that activity part of Association's sales pitch to prospective members—or even to feature that subject in its newsletters, except when actual action in that area was being reported (something that is scarcely an everyday matter, for the Association-negotiated CBAs have three-year terms). But it is needless to speculate on that aspect, which (just as in *Modell*) does not control here in any event. As the later Findings reflect, the owner of the corporate defendant here was clearly aware of Association's function in collective bargaining—so much so that he expressly asked to clarify the fact that *he* would not have to become a union member if his funeral home were to join Association (see Finding 20). And all of the controlling principles for

gainsaid that collective bargaining and other labor matters constitute a principal activity of Association. That is established both by the importance of that activity to Association and its employer-members and, relatedly, by the significant (though not every-day) amount of time that Association spends on those matters. Association and its predecessor organizations have acted as the bargaining agent for the industry's employers for at least 80 years (Tr. 28, 133). Moriarty and several leaders in Association's membership testified to a widespread understanding, based on their experience, that all Association's employer-members are bound by Union's CBAs with Association (see, e.g., Tr. 69, 31, 240, 258, 465).

6. Glueckert Funeral Home, Ltd. ("Glueckert") is an Illinois corporation providing services typical of the funeral industry in this judicial district. Glueckert engages in an industry affecting commerce, as defined by Labor Management Relations Act ("Act"[4]) § 185(a). Glueckert is an "employer" within the meaning of ERISA § 1002(5) (Fact ¶ 3).

7. Union is a labor organization representing employees in an industry affecting commerce as defined by Act §§ 152(5) and 185(a) (Fact ¶ 4).

8. In 1970 John Glueckert, Sr. ("Glueckert, Sr.") purchased an already-established funeral home, which he later incorporated in 1975 as Glueckert Funeral Home, Ltd. In March 1987 Glueckert, Sr. moved the funeral home location to 1520 N. Arlington Heights Road, Arlington Heights, Illinois 60004. At all relevant times Glueckert, Sr. has been the joint owner of 99% of the Glueckert stock, with the remaining 1% being owned by Cecelia Ardo (FPTO Modification filed December 10, 1996).

9. By 1988 Glueckert, Sr. began to consider becoming a member of an association in order, among other reasons, to remain current in developments in the funeral home industry (Fact ¶ 5). In late 1988 or early 1989 Glueckert, Sr. filled out an application for membership in Association. Under that application Glueckert agreed to abide and be bound by the provisions of the "Constitution, By-laws, Rules and Regulations of the Association" (Fact ¶ 18; J. Ex. 2).

10. When Glueckert applied for membership in Association, it received a "full privileged" membership applicable to entities engaged in the funeral directing and embalming and related transportation activities (Fact ¶ 19). At all material times Glueckert has employed individuals who have performed work covered by the CBAs between Association and Union ("covered work") (Fact ¶ 32).

11. Glueckert's application for full privileged membership was approved by Association on March 22, 1989, and Glueckert maintained that membership continuously through September 1994. Glueckert, Sr. signed Association's membership record on or about March 22, 1989 (Fact ¶ 20). Association's membership record card stated that the signer (*id.*):

acknowledge[d] receipt of a copy of the Constitution, By–Laws, Rules and Regulations of the Funeral Directors Services Association of Greater Chicago, and agree[d], as a condition of becoming a member of said Association, to abide and be bound by the Constitution, By–laws, Rules and Regulations now in force or that may hereafter be adopted.

Glueckert regularly paid Association's membership dues from March 1989 through September 1994 (Fact ¶ 19; Tr. 51).

12. During the course of Glueckert, Sr.'s initial course of considering a possible application for Association membership on Glueckert's part, Moriarty sent Glueckert, Sr. some materials that were typically sent to potential members. That transmittal included a July 7, 1988 letter that provided some background information and, in addition to enclosing a partially completed membership application, was accompanied by the previous

---

purposes of this case stem not from any attempted comparative ranking of Association's principal activities, but rather from the application of conventional agency doctrines to Association's activities in the field of collective bargaining.

4. "Act" will be used to encompass that statute *and* the National Labor Relations Act. As with ERISA citations, "Act § —" will refer to the section numbering within 29 U.S.C.

six months of Association newsletters (Tr. 35; J. Ex. 1; Tr. 58–60). Among those newsletters, the February 1988 newsletter included a reference to the Association's agreements with Union and another union, discussed the *forthcoming increases in wage rates* for chauffeurs and cleaning personnel ("effective in the upcoming contract year, March 1, 1988 to February 28, 1989, the final year of the current 3 year agreements"), stated that "[a]dditional information regarding the above is included in the copy of the agreements which have been forwarded to you" and went on to say (emphasis in original):

> If you have any questions, or need an additional copy of the agreements, please call our office. It should be remembered that employees who are paid overscale are still entitled to the full negotiated increase. A final reminder—in the event of a question on a contract clause, or an interpretation of same, please contact the Association office. We are *your* representative—the unions represent your employees. Many times, we can head off a problem area if we are consulted in advance, rather than after the fact.

Immediately after that discussion the February 1988 newsletter went on with a reminder ("[y]ou are no doubt aware") that the health and welfare contribution schedule for the funeral directors, embalmers and chauffeurs contracts likewise entered the third year effective March 1. As part of the same newsletter package sent to Glueckert, Sr., the June 1988 newsletter began with a report that "[y]our Embalmer Negotiating team continues to meet with representatives of Teamster Local Union No. 727 on a new wage agreement ...," explained the difficulty in the negotiations in light of what were said to be "extreme demands" presented by Union and gave notice that "[a] special Meeting of the Membership will be scheduled later in the month in order to receive and consider a report from your Negotiating Team."

13. It is frankly disingenuous for Glueckert to disclaim knowledge that a major function of Association on behalf of its membership was and is the negotiation and execution of CBAs—including the customary provisions for employee benefit plan contributions—on behalf of Association's members. Leaving aside Association's contention that such knowledge was universal throughout the industry (something that, although in all likelihood true of most industry participants, could not be susceptible to proof in technical terms), Glueckert, Sr. had to have that knowledge from the very outset of his discussions with Moriarty (including by reason of his review of the materials referred to in Finding 12, which this Court finds Glueckert, Sr.—who by his testimony demonstrated himself to be a careful businessman—must have read through before applying for membership). Indeed, the very fact that Glueckert, Sr. posed the question that he did before joining (see Finding 20), though he framed it only in terms of whether *he* would have "to be a member of the union" by becoming a member of Association (which it will be remembered is an association of *employers*, not employees), really confirms his understanding that an integral part of Association's activities consisted of dealing with Union and negotiating CBAs, with all of the concomitant provisions entailed in such agreements.[5] And just as Glueckert cannot persuasively disclaim that knowledge that it had at the very outset of its relationship with Association, so the later effort of John Glueckert, Jr. ("Glueckert, Jr.") to distance himself from an Association meeting that dealt with its contractual arrangements with Union and with their binding effect on all Association members (see Findings 37–38) further demonstrates both a like degree of knowledge and an effort to play ostrich in an attempt to avoid the necessary impact of that knowledge on Glueckert's obligations.

14. It is true but irrelevant that the formal documents that were provided to Glueckert did not contain provisions that embodied Association's authority in the respect at issue here. Before 1988, as part of an effort to

---

**5.** If Glueckert, Sr. had not understood that concept to begin with, why would he have asked such a question? Glueckert's counsel have really missed the forest for the trees in stressing that inquiry—or perhaps the realization of the inquiry's inherent undercutting of Glueckert's substantive argument accounts for the very different version of Glueckert, Sr.'s question that his son purported to recall, a version that this Court expressly discredits (see Finding 21).

simplify Association's Constitution and By-laws, its Constitution and By-laws Committee transferred from the Constitution and By-laws then in effect to Association's Official Statements of Policy the language that granted its labor committee the authority to negotiate and, subject to membership approval, to enter into labor agreements (Tr. 37). Those references to collective bargaining were removed from the Constitution and By-laws merely to simplify those documents and to make them more readable (Tr. 40).[6] Thereafter the references to Association's role in collective bargaining appeared in its Official Statements of Policy (Tr. 37; J. Exs. 6, 7). Those Official Statements of Policy authorize its President to appoint a committee representing Association's membership to enter into labor negotiations and to enter into such agreements subject to membership approval, as well as to resolve any disputes or grievances that may arise from such labor agreements (J. Exs. 6 at 40 and 7 at 48).

15. Association and Union have been signatories to a series of CBAs that were effective both before March 1989 and thereafter through and including the present. Those CBAs are in writing and are signed by representatives of Association and Union (Fact ¶ 12). They cover all of Association's employer-members (Tr. 33) and have never covered fewer than all of those members (Tr. 33, 240, 241, 258, 466). Indeed, at the beginning of the negotiation of every CBA entered into between Association and Union from 1967 through 1994, and throughout each negotiation process, Association has uniformly notified Union that Association was bargaining on behalf of all of its employer-members (Tr. 65).

16. It is true but again irrelevant that Association does not solicit or require individual employer-members to provide specific written authorization permitting Association to engage in collective bargaining on their behalf, nor does it seek specific written ratification of negotiated CBAs by Association's individual employer-members (Fact ¶ 13). That authority is conferred both by the fact

of membership in Association and by its standard operating procedure, under which the ratification of each CBA occurs during a special membership meeting called for that purpose. At each such meeting Association's negotiating committee presents to the membership the contract proposal negotiated by that committee with Union, after which the members present discuss the proposal and take action to ratify it. That standard operating procedure for ratification is consistent with Association's governing documents (Tr. § 2).

17. Glueckert never notified either Association or Union that Association did not represent Glueckert in its negotiations of labor agreements (Tr. 62, 63). Accordingly Association could not, and did not, at any time notify Union that Association did not represent Glueckert (Tr. 65)—entirely understandably, for as already stated Association at all times recognized (and expressly notified Union) that it represented *all* of its employer-members (necessarily including Glueckert).

18. Association publishes an annual Reference Guide that it sends to each employer-member. That Guide contains a calendar, Federal Trade Commission regulations, Illinois public health regulations, advertisements, a list of Union registered chauffeurs and trade embalmers, and a list of each of Association's employer-members (including its name, business address and telephone number) (J. Ex. 12; Fact ¶ 8). Association affirmatively communicated the fact of Glueckert's membership beginning in January 1990 to Union by sending it a copy of the Reference Guide (Tr. 222, 65, 155). Glueckert continued to be listed as an Association member in the 1994 Reference Guide (J. Ex. 12 at 349), at a time when Glueckert, Jr. was a member of Association's Reference Guide committee (Fact ¶ 28). Glueckert received the Reference Guide annually (Fact ¶ 26).

19. Moriarty, who was a totally credible witness, testified that he would never avoid

---

6. There is nothing to suggest any other motivation, especially given the facts (1) that Association's activities in that respect were regularly reported to the membership in newsletters and

(2) that whenever negotiations culminated in agreements, those agreements were submitted for membership approval at membership meetings.

discussing the ramifications of Association membership with its potential employer-members (Tr. 66). In particular, Moriarty never deliberately concealed the fact or extent of Association's participation in labor negotiations with Union (Tr. 66–67).

20. Before Glueckert decided to become an Association member, Moriarty met with Glueckert, Sr. to discuss that prospect (Tr. 337, 485). Glueckert, Sr. testified that he then asked Moriarty:

> ... by being a member of the FDSA would I have to be a member of the union. Moriarty answered by saying no, that the FDSA served in negotiations but no more was expressed about it and the fact that I didn't have to be a member of the union was fine with me.

(Glueckert, Sr. Dep. 46–47; accord, Tr. 338). In another demonstration of his credibility, Moriarty did not dispute that—he testified that he had no recollection of that exchange but that it is possible that he told Glueckert, Sr. that he would not individually have to become a union member if Glueckert joined Association (Tr. 489–90).[7]

21. Glueckert, Jr. testified very differently from his father. According to his testimony, Glueckert, Jr. was present at the discussion between Glueckert, Sr. and Moriarty before Glueckert joined Association (Tr. 287). Glueckert, Jr. further testified that Glueckert, Sr. then asked Moriarty whether "we had to become a union firm" and that Moriarty responded by saying "no" (Tr. 289, 330). That testimony is inconsistent with the testimony of both Glueckert, Sr. and Moriarty, and this Court finds it totally lacking in credibility. To the contrary, Moriarty (who was fully aware of the fact that Association always negotiated CBAs on behalf of its entire membership) would not have told, and he did not tell, Glueckert, Sr. that the Glueckert business could be an Association member but not be bound by the terms of the CBAs with Union (Tr. 487). Glueckert Jr.'s noncredible version of the conversation is also inconsistent with Association's correspondence and notices that always informed its employer-members of their obligations under the CBAs with Union (P. Exs. 1, 2; J. Exs. 1, 14).

22. Glueckert, Sr. also testified that during his conversation with Moriarty before Glueckert joined Association, Moriarty told him that Association participates in labor contract negotiations (Tr. 341). As Finding 13 and n. 8 indicate, Glueckert, Sr. already knew about Association's CBAs with Union and knew that by definition the bargaining relationship affected Association's employer-members (knowledge that was implicitly confirmed by Glueckert, Sr.'s having asked Moriarty whether Glueckert's joining Association would require Glueckert, Sr. himself to be a Union member). Even Glueckert, Jr. confirms that during the same conversation he heard Moriarty say "that the FDSA does participate in negotiating a contract ..." (Tr. 290), although Glueckert, Jr. also tried to put a different spin on that statement (Tr. 290–91) to conform to his just-discredited testimony referred to in Finding 21. Again this Court discredits Glueckert, Jr.'s version of the conversation, during which he was an observer rather than an active participant.

23. As an Association employer-member during the period from March 1989 through September 1994, Glueckert regularly received Association newsletters, some of which (like those sent to Glueckert, Sr. before Glueckert joined) referred not only to labor negotiations between Union and Association but also to the CBAs' contractual wage and benefit rates (Tr. 48). Those newsletters, furnished to each employer-member, made it clear that Association represented *all* of its employer-members. Glueckert, through its President and primary shareholder Glueckert, Sr. and its manager Glueckert, Jr., received and read the Association newsletters (J. Ex. 14; Fact ¶ 26).

24. Association maintained a standard operating procedure regarding notices and correspondence to its membership, reporting both that CBAs were open for negotiation and also as to new terms and conditions

---

**7.** As Findings 28 and 33 reflect, the response that Glueckert Sr.'s testimony ascribes to Moriarty was totally truthful—and most importantly for this litigation, that response in no way reduces or otherwise alters Glueckert's liability for the Funds contributions that are claimed by Moriarty in this action.

negotiated in the CBAs, including salary increases and health and welfare contribution rates (Tr. 41–45). All such notices and correspondence were drafted by Moriarty and submitted to Association's President for signature and were then routinely sent to all Association employer-members (Tr. 42, 44). In accordance with that procedure, after March 1989 Glueckert periodically received notices from Association that the CBAs were open for negotiation and, after the negotiation of new CBAs, Glueckert likewise received notices of the new terms and conditions of employment for the bargaining units covered by the revised CBAs (Fact ¶ 27).

25. Association sent a copy of the signed CBAs to every Association member for each CBA that Association negotiated (Tr. 46–47). Each CBA was accompanied by a cover letter that stated "[t]he agreement applies to every member of the Association" (P. Ex. 1 at 761). Glueckert received copies of all such CBAs negotiated after 1989 through 1994 (Tr. 47; Fact ¶ 27). Glueckert unquestionably must have known—and it is hereby held to have known—from Association's newsletters (received both before and after Glueckert joined Association) and from other Association correspondence that Association bargained with Union exclusively on behalf of *all* Association employer-members and that it entered into CBAs on behalf of *all* Association employer-members (necessarily including Glueckert). In that respect, Glueckert could not reasonably rely on Glueckert Sr.'s inquiry, about what *he himself* (as the owner of an employer-member) would individually be required to do in terms of Union membership, as somehow limiting what Glueckert should have known as to its obligations related to its non-owner employees that were created by reason of the CBAs between Association and Union.

26. Although Glueckert notified Association that it was terminating its Association membership in September 1994, Glueckert never gave Union (either then or later) any written notice seeking to modify or to terminate the CBAs as to Glueckert (Tr. 222). Union had no knowledge of Glueckert's notice to Association.

27. Local 727's Secretary–Treasurer and chief Union officer John Coli testified that negotiations for the 1995 Chauffeurs Agreement began in April 1994 (Tr. 224, 235), and this Court so finds. By the terms of the various CBAs, all Association employer-members are bound by the Trust Agreements establishing the two Funds. Thus the 1994 Embalmers CBA (P. Ex. 10 Art. IV § 6) and the 1995 Chauffeurs CBA (P. Ex. 13 Art. V § 6) provide (emphasis added):

> By the execution of this Agreement each employer member authorized the Employer [Association] to enter into appropriate trust agreements necessary for the administration of such funds, and to designate the Employer Trustees under such agreement[s] hereby waiving all notice thereof and ratifying all actions already taken *or to be taken* by such Trustees within the scope of their authority.

Like all other employer-members of Association, Glueckert is bound by the terms of all those CBAs that have—during the relevant time frame (see Conclusions 13–14)—authorized Association to enter into Trust Agreements necessary for the administration of Funds. In that respect the amendments to the Trust Agreements effective May 1, 1995 (P. Exs. 16 and 19) have been adopted by reference in the 1994 Embalmers and the 1995 Chauffeurs CBAs.

28. Each CBA provides that Association's employer-members are obligated to contribute to Funds for the work performed by various classifications in the covered bargaining unit, including amounts per month for each embalmer and full-time driver (with increases effective March 1 of each calendar year) (P. Exs. 6–13). Association's employer-members that do not employ employees performing covered work are not expected to contribute to Funds (Tr. 89–91), nor are employer-members that have no non-owner employees (such as single person owner-operators) expected to contribute to Funds (Tr. 89). In addition to those examples, Moriarty further testified to an industry practice that had been worked out between Association and Union, under which the principal owners of funeral homes that are Association members are not viewed or treated as "employ-

ees" of the funeral homes for purposes of requiring contributions to Funds based on their compensation. That testimony, which is uncontroverted in the record, is credited by this Court—and it explains and validates the answer that Glueckert, Sr. says he received from Moriarty in response to Glueckert, Sr.'s question as to whether *he himself* had to join Union (Finding 20).

29. Glueckert never submitted any contributions or reports to Funds as to its employees who were performing covered work (Tr. 202). Union first learned that Glueckert had such employees in July or August 1994 when a Union business agent visited Glueckert and discovered that it had employees who were performing covered work (Tr. 231; Fact ¶ 52). Funds in turn learned about Glueckert from Union, for Glueckert never advised Funds of the names, job classifications or dates of hire of any of its employees (Tr. 202).

30. Invoices or billings from Funds are initiated in one of two ways:

(a) Employers may call Funds (the most frequent means by which Funds learns about an employer obligated to make contributions for its employees performing covered work). In any such instance personnel employed by Funds will take the names of all employees performing covered work who are employed by the employer, enter those names in Funds' computer and generate a bill to the employer (Tr. 197).

(b) Less frequently a Union business agent may notify an agent of Funds that an employer is utilizing employees who are performing covered work. It is standard practice that Union business agents will periodically go out to employer locations (Tr. 227–28). That is how Funds learned about Glueckert (Tr. 200). It is not feasible, however, for Funds to place major reliance on such business agents to provide effective regular policing or identification of ERISA-violating employers such as Glueckert: Union has only 3 business agents, there are fully 700 to 800 employers within Union's jurisdiction, and the business agents have multifarious duties in relation to those employers (Tr. 228). Nor

do Funds themselves have the personnel to engage in such policing or identification.

31. Funds have always relied primarily upon voluntary employer cooperation from Association's employer-members for the payment of contributions due under CBAs, and with infrequent exception such cooperation has been achieved and maintained (Tr. 200). It is not feasible to determine from a simple review of Association's membership list which employer-members do and which do not have employees performing covered work. Many Association members are entities of the types referred to in the second sentence of Finding 28, from which Funds do not expect contributions to Funds. Only if such an entity hired one or more employees who performed covered work would Funds expect contributions to be made on behalf of such employees (Tr. 200, 89).

32. Union does not negotiate or maintain so-called "members-only" labor contracts with Association (Tr. 222). CBAs negotiated by Union with Association cover all embalmer, funeral director and auto livery chauffeur employees of Association's employer-members, all of which employees must become "member[s] of the Union" by virtue of the union security provisions of those CBAs (P. Exs. 6–13).

33. In the definitions section of Union's CBAs with Association, "employee" is defined as "[a]ny member of the Union who is in the employ of an employer-member [of Association]" and who either "does embalming and/or funeral directing" or "who is an auto livery chauffeur." Those CBAs are mutually intended by Union and Association to apply to all bargaining unit employees of Association's employer-members, without regard to the formal Union membership of any such employees or the lack thereof (P. Exs. 6–13). Moreover, that definition of "employee" renders understandable the industry practice between Association and Union referred to in the third sentence of Finding 28, under which principal owners of funeral homes—though they may technically be employees where the business is in corporate form (as is true of Glueckert)—are not considered as "employees" for purposes of the CBA contribution requirements.

34. In February or March 1994 Glueckert, Jr. became a member of Association's Board of Directors, a position that he maintained until September 1994 (Fact ¶ 28). According to Association's Constitution, "management of this association shall be vested in a Board of Directors" (J. Ex. 11 at 75). Association's By-laws provide that the "Board of Directors shall have supervision, control and direction of the affairs of this association . . ." (J. Ex. 11 at 78).

35. Glueckert, Jr. received a copy of the Official Statements of Policy, which were contained in Association's Board of Directors Handbook, when he joined that Board (Fact ¶ 22; P. Ex. 5). Those Official Statements of Policy specifically authorize Association's President to appoint a committee to enter into labor negotiations and to enter into CBAs subject to approval by the membership (see Finding 14).

36. Minutes of Association's Board of Directors meetings reflect that Glueckert, Jr. was present during meetings at which the CBA negotiations and education programs offered by Union were discussed. And before the Board's July 1, 1994 meeting Glueckert, Jr. received correspondence from Association informing him that at the meeting the Board would discuss the then-ongoing labor negotiations between Association and Union (Fact ¶ 30).

37. Board's July 1, 1994 minutes reflect Association Secretary Thomas Pekras' report on the progress of the labor negotiations and the subsequent ratification of the proposed CBA by the Board of Directors (J. Ex. 13 at 403). Subsequent minutes reflect that during the July 20, 1994 meeting Pekras presented the minutes of the July 1, 1994 special meeting. Both the July 20 and July 1 minutes were approved by the Board (Fact ¶ 20; J. Ex. 13 at 405). Moreover, the minutes of the July 20 meeting reflect, and Glueckert, Jr. admits, that he was present at that meeting (id.). Glueckert, Jr. chose not to attend the July 1, 1994 Board meeting specifically because he knew it was called for the purpose of discussing matters relating to Union (Fact ¶ 30; Tr. 314–15). As the minutes of the July 1 meeting reflect, Glueckert had an "excused absence" from the special meeting on that date (J. Ex. 13 at 403).

38. It is noteworthy that despite his clear knowledge of Association's active involvement in labor negotiations and in entering into CBAs, coupled with his knowledge that *all* of its employer-members were bound by those CBAs, Glueckert, Jr. did not communicate any disclaimer or discomfort as to Glueckert's status in that respect until after Union learned in July or August 1994 of Glueckert's failure to have made the required contributions for its employees (see Finding 29). Instead Glueckert, Jr. sought to play ostrich, such as by his effort to avoid participation in the July 1, 1994 Board meeting. Under all of the circumstances reflected in these Findings and Conclusions, those efforts are ineffective to escape Glueckert's liability under law.

39. Glueckert's payments on behalf of its employees to profit sharing and retirement plans cost less per month than would contributions required by the CBAs to be paid to the Pension Fund (Tr. 202–07; P. Ex. 4 at 796). Glueckert's current monthly premiums for its private health plan are less than the contributions required by the Health and Welfare Fund under the CBAs (Fact ¶ 49).

40. Former and present Glueckert employees who perform or performed covered employment are eligible for pension credits because Glueckert was an Association employer-member firm (Tr. 206). If otherwise eligible, Glueckert's employees are also entitled to file claims for and receive health and welfare benefits (id.).

41. Various other funeral directors testified during the trial as to their respective intentions to be bound or not to be bound by Association's CBAs with Union, and as to their respective understandings in that respect. These Findings and Conclusions have not addressed that testimony for several reasons:

(a) This Court has not accepted Moriarty's counsel's contention that Glueckert was bound by reason of some all-pervasive uniform understanding, whether industry-wide or otherwise, as to the nature and extent of Association's collective bargaining activities. Instead this decision is

based solely on the specific facts that are applicable to the Glueckert–Association relationship.

(b) Several of the witnesses called by Glueckert had an obvious bias stemming from their own businesses' involvement in pending litigation initiated by Funds seeking payment of employee benefit contributions relating to *their* employees.[8] Even apart from the impaired credibility of those witnesses, their individual intentions—unshared with Glueckert—are not probative as to Glueckert's knowledge and understanding and as to its liability on the basis of actual or apparent authority.

(c) By the same token, witnesses called on Moriarty's behalf who testified as to their understandings that they are bound by the CBAs as to *their* employees have also been viewed as offering non-probative evidence as to the same controlling Glueckert-related factors.

To the extent that any such testimony of other funeral directors was presented as an offer of proof on Glueckert's part, it is rejected, as is similar testimony tendered by Moriarty in response.

### Conclusions of Law

1. This Court has jurisdiction of this action under 28 U.S.C. § 1337 and Act § 185(c) and ERISA § 1132(c)(1).

2. Glueckert is an employer within the meaning of Act § 152(2) and ERISA § 1002(5) and has been engaged in an industry affecting commerce within the meaning of Act § 152(7) and ERISA § 1002(12). Funds are employee benefit plans within the meaning of ERISA § 1002(3). Moriarty, as Trustee and fiduciary of Funds, is authorized to bring this action on their behalf under ERISA § 1132(a)(3).

■ 3. As Glueckert was well aware when it joined Association, collective bargaining is one of Association's principal activities on behalf of its employer-members. Glueckert failed to show that employer-members are somehow not bound by the CBAs negoti-

ated by Association because it also participates in other activities in addition to collective bargaining—a real irrelevancy. By analogy, on the other side of the bargaining table a labor organization is not restricted solely to collective bargaining: It may "exist[ ] for the purpose, in whole *or in part*, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work" (the definition of a "labor organization" in LMRA § 152(5), emphasis added). Just so, collective bargaining need not be the sole activity of a multiemployer organization such as Association to bind its employer-members to the resulting CBAs.

■ 4. Glueckert is bound by the CBAs negotiated between Association and Union under common law concepts of agency. Agency relationships are established by showing actual or apparent authority, and actual authority may be either express or implied (*FDL Foods, Inc. v. Kokesch Trucking, Inc.*, 233 Ill.App.3d 245, 256, 174 Ill.Dec. 474, 481, 599 N.E.2d 20, 27 (2d Dist.1992); *Granite Properties Ltd. Partnership v. Granite Inv. Co.*, 220 Ill.App.3d 711, 713–14, 163 Ill.Dec. 139, 141, 581 N.E.2d 90, 92 (1st Dist.1991)). Funds are third party beneficiaries of those CBAs between Association and Union (*Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc); *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir.1988)).

■ 5. In this instance Glueckert is bound by the CBAs negotiated and entered into by Association as its bargaining agent through implied actual authority, which is established by the facts and circumstances surrounding the relationship between principal and agent (*Granite Properties*, 220 Ill. App.3d at 714, 163 Ill.Dec. at 141, 581 N.E.2d at 92). Those facts and circumstances, as set out in the Findings, reasonably imply that Glueckert granted Association actual authority. Implied actual authority is shown by circumstantial evidence that leads an ordinarily prudent person dealing with the agent

---

**8.** Moreover, the testimony of certain of those witnesses was materially impeached in other re-

spects.

to believe that the agent was acting on behalf of the principal (*Mateyka v. Schroeder,* 152 Ill.App.3d 854, 863, 105 Ill.Dec. 771, 776–77, 504 N.E.2d 1289, 1294–95 (5th Dist.1987)). All of the circumstances surrounding Glueckert's six-year membership in Association, including Glueckert's receipt (both before and after joining) of correspondence and newsletters that periodically referred to and detailed the CBAs negotiated by Association on behalf of all of its members, give rise to the reasonable implication that Glueckert granted Association authority to bargain and enter into CBAs on its behalf with Union.[9]

■ 6. As an alternative to actual authority, an agent may bind its principal through the exercise of apparent authority, which arises when a principal creates by its words or conduct the reasonable impression in a third party that the agent has the authority to perform a certain act on the principal's behalf (*Bank of North Carolina, N.A. v. Rock Island Bank,* 630 F.2d 1243, 1251 (7th Cir.1980), reaffirmed in *Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki,* 44 F.3d 451, 463 (7th Cir.1994)). That principle applies with equal force in the current multiemployer-association-negotiated CBA context (see, e.g., *Bennion v. NLRB,* 764 F.2d 739, 743 (10th Cir.1985), cited by Glueckert itself for that proposition).

■ 7. Apparent authority can be derived through inference or circumstantial evidence, and it is "established where there are facts showing one acted for another under circumstances implying knowledge of such acts by the supposed principal" (*FDL Foods,* 233 Ill.App.3d at 256–57, 174 Ill.Dec. at 482, 599 N.E.2d at 28). Apparent authority need not depend upon an express conferring of authority, and its focus rests upon the actions of the principal from which the appropriate inference may be drawn (*Bank of North Carolina,* 630 F.2d at 1251).

■ 8. Agency via apparent authority is based on the principles of equitable estoppel (*Northern Trust Co. v. St. Francis Hosp.,*

168 Ill.App.3d 270, 278, 119 Ill.Dec. 37, 42, 522 N.E.2d 699, 704 (1st Dist.1988)). To establish such estoppel, the facts and circumstances must show that the third party relied to its detriment upon the agency relationship (*id.* at 278–79, 119 Ill.Dec. at 42–43, 522 N.E.2d at 704–05).

9. In this instance, Funds as third-party beneficiaries of the CBAs (and indeed Union, as the employee representative) reasonably believed in good faith that Association possessed the authority to negotiate the agreements on behalf of all of its employer-members, including Glueckert. Funds and Union relied to their detriment on Association's authority to bind all such employer-members. Funds have been established pursuant to the CBAs to collect contributions and to administer health and welfare and pension coverage for all employees who perform covered work for Association's employer-member firms. Funds' reasonable reliance upon Association's authority places such employees in jeopardy absent enforcement of the CBAs, because Glueckert's covered employees (like those of all other employer-members) are eligible for benefits although no contributions were ever paid on their behalf (*Central States, Southeast & Southwest Areas Pension Fund v. Joe McClelland, Inc.,* 23 F.3d 1256, 1259 (7th Cir.1994); *Central States v. Gerber Truck,* 870 F.2d at 1153). That could be devastating to Funds' financial health, and it would be contrary to ERISA's express purpose and intent, for noncompliance by such employers as Glueckert "may well saddle the plans with unfunded obligations" (*Gerber Truck, id.*).

■ 10. For purposes of determining whether an agent's apparent authority has flowed from the principal's conduct, "agency may be established and its nature and extent shown by circumstantial evidence, and reference may be had to the situation of the parties and property, acts of parties, and other circumstances germane to the question" (*Elmore v. Blume,* 31 Ill.App.3d 643,

---

9. Nothing in Glueckert, Sr.'s limited inquiry to Moriarty about whether *he* had to join Union (see Finding 20) attenuates the force of this Conclusion. To the contrary, Glueckert, Sr.'s failure to ask any question about Glueckert's non-owner *employees,* given Glueckert Sr.'s knowledge of Association's collective bargaining activities, strongly supports the implication stated in the text.

647, 334 N.E.2d 431, 434 (3d Dist.1975); accord, *Kalman v.. Bertacchi,* 57 Ill.App.3d 542, 548, 15 Ill.Dec. 204, 210, 373 N.E.2d 550, 556 (1st Dist.1978)).

■■■■■ 11. Here the circumstances surrounding Glueckert's membership in Association demonstrate that Glueckert granted apparent authority to Association to act as its representative. Association's newsletters, CBAs and correspondence received by Glueckert consistently referred to Association's bargaining on behalf of all of its employer-members. Glueckert's silence in the face of that knowledge, during its six years of Association membership, particularly when coupled with Funds' and Union's knowledge as to Association's authority to act for its entire membership, conferred apparent authority on Association to negotiate CBAs on Glueckert's behalf as part of the entire membership for whom Association had like authority. As *Sakun v. Taffer,* 268 Ill.App.3d 343, 351, 205 Ill.Dec. 664, 670, 643 N.E.2d 1271, 1277 (1st Dist.1994) has put it:

> The authority of an agent may be presumed from silence of the alleged principal when he knowingly allows another to act for him as his agent, and the agent's scope of authority may be determined by what persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent, might rightfully believe him to have on the basis of the principal's conduct.

This action comes squarely within the holding of *State Sec. Ins., Co. v. Burgos,* 145 Ill.2d 423, 431, 164 Ill.Dec. 631, 635, 583 N.E.2d 547, 551 (1991) that a principal is responsible to a third party for the authority that the principal *appears* to give its agent (that case itself emphasizes "appears"). And see the discussion of apparent authority from the Union's perspective in the context of multiemployer association collective bargaining in *Trustees of UIU Health & Welfare Fund v. New York Flame Proofing Co.,* 828 F.2d 79, 83–84 (2d Cir.1987).

■■■■■ 12. In conjunction with the determination reflected in Finding 41, any testimony from other Association employer-members concerning their intent to be bound or not to be bound by the Association's CBAs with Union is entirely irrelevant in determining whether Glueckert was bound by the CBAs through its course of conduct. Agency authority rests upon the actions of the principal, in this instance Glueckert, and is not established by other employer-members' similar or dissimilar understandings or conduct. Under ERISA evidence of an employer's own subjective intent is also irrelevant to determine whether it is bound by a CBA (*Robbins,* 836 F.2d at 332–33). Uncommunicated subjective intent is irrelevant because "secret hopes and wishes count for nothing" (*Skycom Corp. v. Telstar,* 813 F.2d 810, 814 (7th Cir. 1987)). Accordingly any uncommunicated or miscommunicated concern on the part of Glueckert, Sr. (as for example if he had wanted, but had failed to communicate, an intention that he wished to avoid any requirement of Union membership, and thus perhaps to avoid any need for employee benefit plan contributions, as to Glueckert's employees—rather than Glueckert, Sr.'s actual inquiry of Moriarty, literally limited as to his own individual status) would in no way vitiate the implied actual authority or apparent authority referred to in the prior Conclusions.

13. From April 1989 through and including the present, Glueckert violated its obligations to Funds contained in the CBAs when it failed to submit reports and to pay contributions for work performed by its covered employees (Tr. 202; Fact ¶ 32). Glueckert is liable to the Funds for contributions owed from March 1988 through the present on behalf of all of its employees (excluding Glueckert, Sr. as an "employee" for that purpose) who have performed embalmer, funeral director and livery chauffeur services.

■■■■■ 14. What has been said in Conclusion 13 extends to the present time because Glueckert has been and continues to be obligated to contribute to Funds under the current CBAs (the 1994 Embalmers–Funeral Directors CBA and the 1995 Chauffeurs CBA) negotiated between Association and Union. Although Glueckert notified Association in September 1994 of the termination of its Association membership, Glueckert has not provided Union with adequate notice of its withdrawal from the multiemployer negotiating association. For such purposes ade-

quate notice requires specific written notice to *Union* withdrawing from the multiemployer association *before* the date set by the prior CBA for contract modifications or before the commencement of negotiations. *Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.,* 823 F.2d 289, 295–96 (9th Cir.1987) is on all fours with this case in that respect; accord, *Trustees of UIU Health & Welfare Fund,* 828 F.2d at 84; and see the approval of the NLRB's rules to that effect in *Charles D. Bonanno Linen Serv. v. NLRB,* 454 U.S. 404, 410–11, 102 S.Ct. 720, 724–25, 70 L.Ed.2d 656 (1982).

15. Glueckert advances a claimed laches defense to this action. But any such defense requires the defendant to establish, as one of its components, a lack of diligence on the plaintiff's part (*Zelazny v. Lyng,* 853 F.2d 540, 541 (7th Cir.1988), cited by Glueckert for that proposition). No such lack of diligence has been shown here. Glueckert must be held to have known of its obligations to make Funds contributions, and it is reasonable for Funds to rely in principal part on participating employers' compliance with their legal obligations (Funds do not have the personnel or facilities to engage in active policing efforts in that respect, nor is Union able to do so—see Findings 30–31). This action was brought well within a reasonable time after Funds learned of Glueckert's noncompliance as the result of a routine visit by one of Union's representatives, who in turn caused the information to be given to Funds.

\* \* \*

Glueckert is ordered to provide Moriarty forthwith with all information necessary to calculate Glueckert's obligations to Funds in accordance with these Findings and Conclusions. This action is set for a status hearing at 8:45 a.m. June 30, 1997.